ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

Lanit Amira

*(Write the full name of each plaintiff who is filing
this complaint. If the names of all the plaintiffs
cannot fit in the space above, please write "see
attached" in the space and attach an additional
page with the full list of names.)*

-against-

Maimonides Hospital
Maimonides Paramedic Services
Hatzalah Paramedic services

*(Write the full name of each defendant who is
being sued. If the names of all the defendants
cannot fit in the space above, please write "see
attached" in the space and attach an additional
page with the full list of names. Do not include
addresses here.)*

**Complaint for Violation of Civil
Rights**
(Non-Prisoner Complaint)

Case No. CV 21 - 3976
*(to be filled in by the Clerk's Office)*

Jury Trial:  ☑ Yes  ☐ No
*(check one)*

KOVNER, J



RECEIVED
JUL 06 2021
PRO SE OFFICE

MERKL, M.J.

---

NOTICE

Federal Rules of Civil Procedure 5.2 addresses the privacy and security concerns resulting
from public access to electronic court files. Under this rule, papers filed with the court should
*not* contain: an individual's full social security number or full birth date; the full name of a
person known to be a minor; or a complete financial account number. A filing may include
*only*: the last four digits of a social security number; the year of an individual's birth; a
minor's initials; and the last four digits of a financial account number.

Plaintiff need not send exhibits, affidavits, grievance or witness statements, or any other
materials to the Clerk's Office with this complaint.

In order for your complaint to be filed, it must be accompanied by the filing fee or an
application to proceed in *forma pauperis*.

I.    **The Parties to This Complaint**

A.    **The Plaintiff(s)**

Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

Name — Lanit Amira
Street Address — 830 46th street
City and County — Brooklyn  Kings County
State and Zip Code — NY 11220
Telephone Number — 732 328 0380
E-mail Address — Lanitamira@gmail.com

B.    **The Defendant(s)**

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title (if known) and check whether you are bringing this complaint against them in their individual capacity or official capacity, or both. Attach additional pages if needed.

Defendant No. 1

Name — Maimonides Hospital
Job or Title
(if known) —
Street Address — 4802 10th avenue
City and County — Brooklyn  Kings County
State and Zip Code — NY 11219
Telephone Number — 718 283 6000
E-mail Address
(if known) —

Defendant No. 2

Name                    Maimonides Paramedic Services

Job or Title
(if known)

Street Address          VO 4802 10th avenue

City and County         Brooklyn  Kings County

State and Zip Code      NY  11219

Telephone Number        718 283 6000

E-mail Address
(if known)


Defendant No. 3

Name                    Hatzalah Paramedic Services

Job or Title
(if known)

Street Address          5215 16th avenue

City and County         Brooklyn  Kings County

State and Zip Code      NY  11204

Telephone Number        718 871 6644

E-mail Address
(if known)


Defendant No. 4

Name

Job or Title
(if known)

Street Address

City and County

State and Zip Code

Telephone Number

E-mail Address
(if known)

II.    **Basis for Jurisdiction**

Under 42 U.S.C. § 1983, you may sue state or local officials for the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." Under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), you may sue federal officials for the violation of certain constitutional rights.

A.    Are you bringing suit against *(check all that apply)*:

☒    State or local officials (a § 1983 claim)
☐    Federal officials (a *Bivens* claim)

B.    Section 1983 allows claims alleging the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." 42 U.S.C. § 1983. If you are suing under section 1983, what federal constitutional or statutory right(s) do you claim is/are being violated by state or local officials?

right to refuse medical care, unlawful seizure of person and property, EMTALA, HIPAA

C.    Plaintiffs suing under *Bivens* may only recover for the violation of certain constitutional rights. If you are suing under *Bivens*, what constitutional right(s) do you claim is/are being violated by federal officials?

D.    Section 1983 allows defendants to be found liable only when they have acted "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia." 42 U.S.C. § 1983. If you are suing under section 1983, explain how each defendant acted under color of state or local law. If you are suing under *Bivens*, explain how each defendant acted under color of federal law. Attach additional pages if needed.

The defendants held me involuntarily in the hospital, which can only be done as provided by NY MHL.

4

III.     **Statement of Claim**

State as briefly as possible the facts of your case.  Describe how each defendant was
personally involved in the alleged wrongful action, along with the dates and locations of
all relevant events.  You may wish to include further details such as the names of other
persons involved in the events giving rise to your claims.  Do not cite any cases or
statutes.  If more than one claim is asserted, number each claim and write a short and
plain statement of each claim in a separate paragraph.  Attach additional pages if needed.

A.     Where did the events giving rise to your claim(s) occur?

Started in my home and then in
Maimonides Hospital

B.     What date and approximate time did the events giving rise to your claim(s) occur?

December 10 - December 13, 2018

C.     What are the facts underlying your claim(s)?  *(For example:  What happened to
you?  Who did what?  Was anyone else involved?  Who else saw what happened?)*

See attached for statement of facts

Defendants Hatzalah and Maimonides
paramedics forced me to get in their
ambulance. They brought me to Maimonides
Hospital. At Maimonides, they did not
have a staff MD evaluate me. They
took my property and admitted me
against my will and then kept me
for 3 days without reason.

5

IV.    **Injuries**

If you sustained injuries related to the events alleged above, describe your injuries and
state what medical treatment, if any, you required and did or did not receive.

I missed my court appearance and my visitation
with my kids was suspended, I suffered
great emotional and mental damage, I
was ashamed and humiliated, I had nightmares
for ~~many~~ months.

V.    **Relief**

State briefly what you want the court to do for you.   Make no legal arguments. Do not
cite any cases or statutes.  If requesting money damages, include the amounts of any
actual damages and/or punitive damages claimed for the acts alleged.  Explain the basis
for these claims.

Because my rights were so greatly violated
I'm requesting damages of $250,000 from
defendant Hatzalah Paramedic Services,
$400,000 from defendant Maimonides Paramedic
services and $3,500,000 from defendant
Maimonides Hospital.

See attached complaint for more detail.

VI.    **Certification and Closing**

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my
knowledge, information, and belief that this complaint: (1) is not being presented for an
improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the
cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for
extending, modifying, or reversing existing law; (3) the factual contentions have
evidentiary support or, if specifically so identified, will likely have evidentiary support
after a reasonable opportunity for further investigation or discovery; and (4) the
complaint otherwise complies with the requirements of Rule 11.

**A.**    **For Parties Without an Attorney**

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: _July 6_, 2021.

Signature of Plaintiff ___Lanit Amira___

Printed Name of Plaintiff ___Lanit Amira___

# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| **Plaintiff,** | **42 U.S.C.S. § 1983** |
| **Lanit Amira,** | **Complaint for Violation of Civil Rights** |
| **-v-** | |
| **Hatzalah Paramedic Services** | **Case No.** |
| **Maimonides Paramedic Services** | _____ |
| **Maimonides Hospital** | |
| | **Jury Trial Demanded:** |

LANIT AMIRA; Pro Se Representation

830 46th Street
Brooklyn, N.Y. 11220

(732) 328-0380

LANITAMIRA@gmail.com

# CONTENTS

PRELIMINARY STATEMENT                                                          3

PARTIES                                                                        3

    Plaintiff                                              3

    Defendants                                             3

JURISDICTION                                                                   4

    USCS § 1983; Deprivation of Civil Rights               4

    Violations Actionable Under 42 USCS § 1395dd, EMTALA   5

    Violation of 42 USCS § 1320d-5 HIPAA                   6

STATEMENT OF FACTS                                                             7

    Illegal Seizure by Paramedics                          7

    Maimonides Hospital and the admitting doctor failed to evaluate Ms. Amira

    in the emergency room.                                 9

PRIMA FACIE EVIDENCE THAT SUPPORTS THE PLAINTIFF'S

ALLEGATIONS                                                                   18

VIOLATIONS                                                                    19

    Paramedics: Hatzalah Paramedic Services and Maimonides Paramedic

    Services Violated Lanit's Right to Refuse Medical Care  19

    Maimonides Hospital                                    20

      Failed To Evaluate Lanit in The Emergency Room   20

      Failed to Give Lanit Her Daily Prescription      21

      Lab-Tests Lanit Without Consent                  21

Disclosed Private Medical Information to Lanit's Family Without
Authorization; Violation of HIPAA                                      22

Caused Lanit to Miss Court Without Reason                              24

Removed Lanit's Property Without Consent; Deprivation of civil rights
without due process pursuant to 42 USCS § 1983, illegal seizure of
property, false imprisonment                                           24

Gave Lanit Anti-Psychotic Medication Negligently Without Providing a
Reason                                                                 25

Caused Lanit to Feel Emotional and Mental Distress                     25

Unsafe Treatment of Patient                                            25

CAUSE OF ACTION                                                        26

Maimonides Hospital                                                    26

Hatzalah Paramedic Services                                           34

Maimonides Paramedic Services                                          34

# PRELIMINARY STATEMENT

This complaint is being brought forth by the plaintiff, Lanit Amira, against the defendants, Hatzalah Paramedic Services, Maimonides Paramedic Services, and Maimonides Hospital, for the 3-day involuntary hospitalization which took place from December 10-December 13, 2018. The defendants seized Lanit from her home without cause, without meeting due process requirements, and then placed her in Maimonides psych ward without evaluating her first. Maimonides hospital then forced Lanit against her will to stay at the hospital without giving her any explanation of why or when she would be released. Lanit has no history of having a mental illness and did not meet the needs of psychiatric hospitalization.

# PARTIES

**Plaintiff**

1.      Plaintiff-Patient, Lanit Amira, is 32 years old and currently resides at 830 46th street Brooklyn, N.Y. 11220. Ms. Amira is a CPA accountant.

2.      The plaintiff, Lanit Amira, was unlawfully hospitalized for 3 days, from December 10th until December 13th in 2018. During this hospitalization, Ms. Amira's civil rights were violated by the defendants. Ms. Amira has never been diagnosed with any mental illness and does not have a history of psychosis or any other mental illness. She was involuntarily hospitalized against her will without medical reason.

3.      The plaintiff, Lanit Amira, has written this complaint and affirms the information in this complaint is true.

**Defendants**

3

4.      Defendant Maimonides Hospital is located at 4802 10th avenue Brooklyn, N.Y. 11219. The main number is (718) 283-6000.

5.      Defendant Hatzalah Paramedic Services is a non-profit ambulance services organization located at 5215 16th Ave, Brooklyn, NY 11204. The main number is (718) 871-6644.

6.      Defendant Maimonides Paramedic Services is a part of Maimonides Medical Center's Emergency Response Unit. Defendant's place of service and phone number is same as Maimonides, above.

7.      Defendant Dr. Ross Deleonardo was the admitting doctor in the Maimonides Emergency Room. His office is located at 11 N Amsterdam Avenue New York, NY 10025 and office phone number is (212) 523-6500.

8.      Defendant Dr. Mark Makar was a resident doctor who was most involved in the Plaintiff's hospitalization. Defendant's contact information is unknown, but Maimonides should have his information.

## JURISDICTION

**USCS § 1983; Deprivation of Civil Rights**

9.      42 USCS § 1983 provides that every "person" who, under color of any statute, ordinance, regulation, custom, or usage of any State subjects, or "causes to be subjected," any person to the deprivation of any federally protected rights, privileges, or immunities shall be civilly liable to the injured party.

10.     The defendants violated the plaintiff's civil right to deny medical care and kept the plaintiff in the hospital psych ward involuntarily without medical reason. Additionally, the defendants seized the plaintiff from her home without cause, removed the plaintiff's property without due process and denied the plaintiff of her right to leave the hospital's psych ward for 3 days without

medical reason. These are all civil and constitutional violations, done by the defendants.

11.    The defendants were acting for the state of New York and therefore, are liable for violating the plaintiff's civil rights and for failing to act in accordance with New York Mental Hygiene Laws. MHL specifies when and how it is legal for medical agencies to involuntarily hospitalize a patient. The defendants disregarded the relevant Mental Hygiene Laws.

12.    In New York, the due process stipulations for hospitalizations are determined by the Mental Hygiene Laws for both involuntary and voluntary psychiatric hospitalizations. New York State is responsible for the adequate and ethical care of the state's mentally ill population, as part of the Parens Patriae Doctrine.

13.    The defendants were therefore acting for the state and are considered agents of the state.

**Violations Actionable Under 42 USCS § 1395dd, EMTALA**

14.    42 USCS § 1395dd, 'EMTALA' is a federal law that mandates hospitals to evaluate patients that are brought to the emergency room by a staff MD.

15.    EMTALA also mandates that a patient's resistance to treatment must be noted and respected.

16.    DEFENDANT Maimonides Hospital failed to evaluate PLAINTIFF Lanit Amira in the emergency room and failed to explicitly note that Lanit objected to medical care. Lanit's objection was disregarded, and she was admitted to the hospital involuntarily without prior staff MD evaluation.

5

17.    There is a two-year limit on taking action under 42 USCS § 1395dd, which starts to countdown from when injury is made known to a plaintiff. The plaintiff's injuries were related to mental health and social dynamics and are therefore harder to measure related to when injuries were realized and acknowledged. How long it takes to heal and gain the confidence to take action about being falsely labeled as mentally ill is relative —there's a stigma which Lanit had to overcome through research and validation that her civil rights were indeed violated.

18.    Lanit was not emotionally ready to discuss her trauma or look into the law until years after her hospitalization. Additionally, the hospitalization caused damages to the plaintiff's custody case, which also took time and effort to overcome.

19.    The plaintiff requests an extension be granted with regards to the defendant's violation of EMTALA. The plaintiff shouldn't be punished for the length of time it took to regain herself due to the defendants' misconduct. Furthermore, the gross negligence of the hospital and the medical staff should not be discounted simply because of a time limit.

**Violation of 42 USCS § 1320d-5 HIPAA**

20.    During the unlawful hospitalization, Maimonides' medical staff violated the plaintiff's privacy several times by discussing private medical information with the plaintiff's family and parents without the plaintiff's consent.

21.    Dr. Ross Deleonardo and Dr. Mark Makar spoke to Lanit's family without consent about her medical matters and without an advance directive on file. Both of these doctors violated HIPAA by discussing medical information with the plaintiff's parents.

6

22.    The hospitalization paperwork clearly shows that the plaintiff had capacity; therefore, speaking to the plaintiff's parents and family without the plaintiff's consent was unlawful.

## STATEMENT OF FACTS

**Illegal Seizure by Paramedics**

23.    On December 10th, 2018, Lanit's mother, Goldi Kopolovich, called the paramedics because she was trying to reach a hotline that provides information about therapy. Goldi was trying to obtain a therapist for her daughter Lanit because Goldi and her husband, Eli Kopolovich, Lanit's parents, believed that Lanit needed therapy. Much of Lanit's parents' beliefs revolved around the fact that Lanit stopped being religious and her parents were Jewish Orthodox (they thought that Lanit was mentally ill because she didn't want to be religious anymore).

24.    Goldi called Hatzalah (paramedics services) because Hatzalah is a Jewish organization that provides paramedic services and general medical assistance and services.

25.    Hatzalah call center decided to send an ambulance for Lanit even though there was no medical emergency.

26.    The Hatzalah paramedics came to Goldi's home, where Lanit resides, and asserted that Lanit was obligated to go to Maimonides Hospital. Lanit tried to reason with the paramedics and told them that she has no mental illness and no history of having a mental illness, but the Hatzalah paramedics continued to forcefully assert that Lanit was legally obligated to listen and comply; they wanted to take Lanit to Maimonides Hospital.

27.    After about an hour of Lanit refusing medical care, the Hatzalah paramedics decided to call Maimonides's paramedics, who arrived to Lanit's home with a police officer.

28.    The Maimonides' paramedics surrounded Lanit and told her that if she doesn't comply, she will be escorted to the emergency room by the police officer. They further pressured Lanit to comply with the paramedics.

29.    Lanit informed the paramedics that she had court the following day and she didn't want to stay overnight. The paramedics assured Lanit that she would be seen by a staff MD in the emergency room that day. The paramedics also assured Lanit that if the staff MD confirms that Lanit doesn't have any mental health issues, Lanit would be released before the day is over.

30.    Lanit explicitly refused to go to the emergency room but after several hours of being pressured by both Hatzalah Paramedic Services and Maimonides Paramedic Services members and being threatened to be dragged to the emergency room by the police, Lanit complied because she was mislead by the paramedics that she had no choice.

31.    The paramedics acted with negligence and manipulatively; they didn't fill out any forms as provided by MHL for involuntary hospitalization. If the paramedics felt that Lanit needed hospitalization, they should have filled out the forms prescribed by MHL for involuntary hospitalization[1].

32.    Furthermore, all patients have the right to refuse medical care. Lanit's right to refuse medical and paramedic care was violated even though Lanit informed the paramedics that she has no history of mental illness. MHL doesn't support the paramedics' reasoning for forcing Lanit to comply.

---

[1] The Office of Mental Health has specific forms which all peace officers who are transporting mentally ill patients involuntarily must fill out. These are OMH Forms 476 or OMH Form 482.

8

**Maimonides Hospital and the admitting doctor failed to evaluate Ms. Amira in the emergency room.**

33.    The paramedics brought Lanit to the emergency room in Maimonides Hospital at about 4pm.

34.    None of the staff MD approached Lanit. Instead, a nurse in the emergency room told Lanit to remove her clothes, submit a urine cup and place her belongings in a plastic bag. Lanit objected and demanded to be seen by a doctor first. The emergency room nurse told Lanit that if she doesn't comply, the police would be called and Lanit would be escorted to the psych ward.

35.    Lanit's belongings, including her phone, clothes and purse was taken by the nurse without first obtaining Lanit's consent[2].

36.    The same nurse promised Lanit that as soon as she puts the hospital robe on, a doctor will see her.

37.    Lanit waited for a doctor and noticed that a staff MD was speaking to her parents, who were also in the emergency room. The staff MD never approached or spoke to Lanit. Based on the hospital discharge paperwork, Lanit told the admitting doctor, Dr. Ross Deleonardo, that Lanit's behavior was more aggressive in the recent weeks that had passed.

38.    Dr. Ross Deleonardo admitted Lanit without first speaking to Lanit, even though Lanit was over 18 years old and had capacity to make her own medical decisions. Dr. Ross Deleonardo discussed Lanit's private medical information with Lanit's parents without first obtaining Lanit's consent to discuss her medical information with her parents.

39.    Medical staff moved Lanit to the overnight observatory room for patients with mental illnesses. Lanit wasn't told where she was being placed or

---

[2] See Exhibit B. Property Sheet. Lanit's signature was never obtained when her property was first removed.

9

why. Lanit was still under the notion that a doctor would evaluate her and continuously stopped passing staff to ask them when a doctor would evaluate her. Ms. Amira informed the staff that she had court the following day (December 11, 2018) and that she can't miss her court appearance. This was for her Family Court custody case.

40.    After a few hours, a staff member informed Lanit that she would not be evaluated that day but that she would have to spend the night under observation and that a doctor would evaluate Lanit the following day. Lanit began to protest but the staff told her that she has no choice and must stay overnight due to observation rules. Lanit didn't have her phone because the hospital took it from her earlier and the hospital staff refused to return the phone, even though Lanit had court the following day and needed to inform people of the unexpected change of events.

41.    While Lanit was in the observation room, a staff member took samples of Lanit's blood. Later on, Lanit would find out that the hospital tested Lanit's urine for drugs and tested Lanit's lab-work (blood-samples) for sexually transmitted diseases. Both tests were done without Lanit's consent. Testing for sexually transmitted diseases legally requires a consent form, which the hospital failed to have Lanit look over and sign. These tests were done unlawfully[3].

42.    That night in the observation room, Lanit asked for saline nose spray due to having allergy symptoms that stopped Lanit from sleeping. The observation room nurse informed Lanit that the hospital didn't have saline nose spray but instead he could give her Benadryl.

---

[3] Exhibit A, Hosp. Discharge Papers

10

43.    The Benadryl didn't help Lanit and she requested a different medication. The observatory room nurse gave Lanit a different anti-histamine medication, Atarax[4]. This also didn't work.

44.    The nurse should have called a doctor. Instead, he (the nurse) placed an order for a third medication, Thorazine, which is an anti-psychotic medication. Lanit had never taken anti-psychotics before and was not aware of what this medication was.

45.    Before taking the medication, Lanit told the nurse that she doesn't want any "medication for psychosis" and asked the nurse what Thorazine was. The nurse told Lanit not to worry because doctors give this medication to patients often. He told her it will help her get some rest. Lanit asked if it's an anti-histamine and he replied that it has several uses. The nurse was vague and did not say that it was an anti-psychotic. Lanit noticed his vagueness and expressed to him *again* that she didn't want anti-psychotics and that her hospitalization notes will probably be submitted to Family Court; the last thing she needs is for Family Court to see that she was on medication for psychosis. The nurse responded by saying that she has nothing to worry about.

46.    The nurse failed to truthfully explain to Lanit what Thorazine was and gave Lanit anti-psychotics even though Lanit had no history of taking any anti-psychotics. The nurse should have called a doctor before ordering anti-psychotics and Maimonides Hospital was negligent in how this controlled medication was administered without staff MD's supervision. The hospitalization paperwork makes no mention about why this medication was even given to Lanit as well as the other anti-psychotic medication that was administered to Lanit later on during the hospitalization, Ativan.

---

[1] Exhibit A, Hosp. Discharge Papers, p. 5-6 lists the medications which were administered to Lanit during the hospital stay.

11

47.    The nurse also placed Lanit's mental health in danger because this medication could have influenced Lanit to behave differently; more sleepy and less aware. Since Lanit wasn't evaluated by a doctor before the Thorazine was administered, this medication could have influenced Lanit and caused an inaccurate evaluation of Lanit's mental health.

48.    Lanit fell asleep shortly after taking the Thorazine because the side effects are sleepiness and lack of aware cognition.

49.    After a few hours, at about 3am, the observatory nurse woke Lanit up and informed Lanit that she was being taken "upstairs" where she'll get "her own bed." The nurse failed to tell Lanit that she was being admitted to the psych ward on the 6th floor of Maimonides Hospital.

50.    A staff MD still didn't evaluate Lanit before Maimonides Hospital decided to admit her. There was also no staff MD evaluation between being under psychiatric observation and being admitted to the psych ward. In other words, there was no medical reasoning in admitting Lanit to the psych ward (or the observatory room).

51.    Lanit was groggy from the medication and wasn't able to put up much of a logical argument due to the lack of awareness. Hospital staff wheeled Lanit up to the 6th floor.

52.    The hospital staff placed Lanit in a room with a female psychiatric patient who was violent and woke up frequently in the middle of the night with violent outbursts, at times towards Lanit. This was quite inappropriate since Lanit didn't have a mental illness. Naturally, this was scary for Lanit being that she had no previous history of being in a psych ward. This roommate would also later on steal Lanit's $3,000 hair extension and hide it under her bed, which reeked of urine.

12

53.    The following morning, on December 11, 2018, Lanit requested to receive her daily medication, Adderall, which Lanit was taking for ADHD. Lanit was prescribed Adderall by doctors and was taking this medication for over 10 years prior to the hospitalization. This medication was medically necessary for Lanit to function. Missing a dose of Adderall causes unnecessary withdrawal and uncomfortable mentally, emotionally and physically.

54.    The hospital failed to give Lanit her medication during the entire 3-day hospitalization stay without explaining why. Lanit requested her medication several times but was denied without explanation. The hospital was well aware that Lanit was on this medication (prescribed by a doctor). Additionally, amphetamine (Adderall) came up in Lanit's lab test, so Maimonides was well aware that Lanit was on this medication and yet did not give her the medication that she needed to mental health and cognition. This is ironic since Lanit was in a psych ward, which is supposed to care for Lanit's mental health and not injure her mental health.

55.    On December 11, 2018, in the morning, several hospital staff members met with Lanit. During this meeting, which lasted about 45 minutes, 3 staff members sat across Lanit and asked her questions: 1. Dr. Mark Makar, MBCHB[5] 2. Social worker, Megan Reilly, LMSW, 3. A 3rd employee who may have been a doctor but his name is omitted from the hospital discharge paperwork. This was the first time that a doctor or psychologist spoke to Lanit and would be the last.

56.    Later on, Lanit would find out that Dr. Makar, who was assigned as Lanit's main doctor overseeing the hospitalization, was a resident and not a psychiatrist. This means that Maimonides was negligent to ensure that a

---

[5] Bachelor of Medicine and Bachelor of Surgery (awarded in the U.K. and other countries such as New Zealand and South Africa)

13

psychiatrist evaluated Lanit while Lanit was being held involuntarily in Maimonides' Psychiatric Ward.

57.    This meeting was not a mental health evaluation; Maimonides failed to do a mental health evaluation on Lanit throughout Lanit's stay at Maimonides psychiatric ward. Instead, this meeting was simply asking Lanit questions about why her parents felt that Lanit needed mental help. Lanit discussed her recent divorce and also informed the medical team that her ex-husband had hacked her phone and computer—Lanit told the medical staff that her parents believed she had mental health problems because they didn't understand technology and they believed Lanit was paranoid, even though spyware and hacking is a common modern-day phenomenon and is quite common when undergoing divorce. They also believed she had mental illness because she decided not to be religious anymore (Jewish Orthodox). Even though Lanit's parents may have thought that Lanit's life choices and beliefs were "abnormal," these are common occurrences which do not signify mental illness.

58.    During this meeting, Lanit expressed that she would like to leave and requested to receive her daily prescription of Adderall. Dr. Makar told Lanit that the doctors will discuss what the next step is and keep Lanit informed. He also told Lanit that her family was coming later on in the day.

59.    After that meeting, Lanit was sent back to her psych ward room. Nobody returned to Lanit to give her information about what the doctors decided. Additionally, a nurse told Lanit that the doctor decided to give Lanit another dose of Thorazine, however, the nurse did not receive an order for Adderall and did not have an explanation as to why the Adderall wasn't given.

14

60.    In the late afternoon, Dr. Makar came to Lanit and informed her that her family was in a conference room. Apparently, Lanit's family came an hour earlier and had a meeting with Dr. Makar along with other medical staff members. This was done without Lanit's consent or prior acknowledgement.

61.    This violated Lanit's privacy greatly, especially because Lanit's mother brought along Lanit's journal, which was personal and involved complex trauma and deep inner thoughts after being a victim of domestic abuse. Lanit's parents also brought along a friend of theirs, whom Lanit had never met before. This person was in the meeting and was told information which she shouldn't have been privy to.

62.    Dr. Makar described the family meeting as unproductive, as noted, "Several family meetings were held with and without the patient present during which poor family communication can be observed." (Exhibit A, discharge papers p. 8)

63.    Even though it was clear that Lanit wanted to leave the hospital and that the reason why Lanit was even brought to the hospital was unreliable (since her parents and their beliefs were poorly related and ambiguous as noted by Dr. Makar), Dr. Makar failed to discharge Lanit from the hospital. He even refilled the anti-psychotics and prescribed a different anti-psychotic, Ativan[6] without discussing it with Lanit first. Lanit was unaware of what the medications that were given to her were and instead, felt pressured to follow orders out of desperation to leave the hospital.

64.    After the family meeting, Dr. Makar disappeared and didn't speak with Lanit. Lanit was kept in the dark about why she was being kept in the

---

[6] Exhibit A, Hosp. Discharge Papers p. 5-6

15

psych ward for another night and wasn't given any information about a diagnosis or what the status of the doctors' decision was.

65.     The following day, December 12th 2018, Dr. Makar came to Lanit to take her for an MRI test. Lanit asked him when she would be discharged and Dr. Makar vaguely informed Lanit that he'll have more answers for her after the MRI test. The MRI test showed normal brain activity and did not show any signs of psychosis or mental disorders.[7]

66.     Since Lanit didn't display any mental health illnesses, there was no reason to restrain Lanit in order to perform an MRI.

67.     After the MRI, Dr. Makar transferred Lanit back to the psych ward and did not get back to her about the results for the rest of the day. Dr. Makar did however switch Lanit from Thorazine to Ativan without discussing either medications with her first. He did not prescribe Lanit her regular daily prescription, Adderall, and did not provide a reason for why.

68.     Lanit had side effects from taking anti-psychotics for the first time while simultaneously being deprived of her daily medication. She had intense irritation. By giving her new medication and withholding Lanit' daily medication, Maimonides risked placing Lanit in a situation where she could blow up at the staff members, who weren't giving her a clear response about her hospitalization. Like any normal individual, Lanit was frustrated at the lack of any evaluation and being kept in the dark. However, this frustration could have been dangerous in Lanit's situation.

69.     That's because, if Lanit would have blown up at the Maimonides hospital staff, her frustration could have been noted as a nervous breakdown or even as a symptom of mental illness. That is why involuntary hospitalization in

---

[7] Exhibit C, MRI Results 12/12/18

a psych ward is so violating and should be executed with the highest level of morale as well as following the law in all aspects. Because once someone is labeled as mentally ill, anything the person does to rationalize or object to treatment can be referred to as "further proof of non-compliance," etc.

70.    The following day, December 13ᵗʰ, 2018, Dr. Makar came to Lanit and informed her that she would be discharged that day. He gave no reasoning about why she was held for those days, which also caused her to miss her Family Court appearance without giving the court a notice, and Dr. Makar also didn't tell Lanit why she was being discharged.

71.    Dr. Makar told Lanit that she'd be discharged but he did not allow Lanit to be discharged until Lanit's parents came to the hospital. Again, Dr. Makar reached out to Lanit's parents without her consent and requested that they pick Lanit up from the hospital. He did this even though Lanit wasn't diagnosed with any sort of mental illness and therefore, did not need to be picked up from the hospital.

72.    Lanit waited for her parents for hours. Maimonides refused to return Lanit's property until her parents came. So even though Dr. Makar discharged Lanit at noon, according to the hospitalization discharge papers, Lanit was only allowed to leave the hospital in the late afternoon, closer to evening time, which is when Lanit's parents decided to pick Lanit up.

## PRIMA FACIE EVIDENCE THAT SUPPORTS THE PLAINTIFF'S ALLEGATIONS

73.    Exhibit A, discharge paperwork from Maimonides Hospital, repeatedly provides notes that prove that Lanit didn't meet the requirements for neither involuntary nor voluntary psychiatric hospitalization.

17

| | |
|---|---|
| "No surrogate decision maker designated and no advanced directive completed...reason: patient refused but information provided." | Exhibit A, p. 3/10 |
| "**Normal cognition** and **no difficulties in doing errands alone**." | Exhibit A, p. 5/10 |
| "Patient denied hallucinations, suicidal or homicidal ideation." | Exhibit A, p. 8/10 |
| Dr. Makar noted, "She [Lanit] remained linear and goal directed through the entire interview and responded appropriately when beliefs were challenged." | Exhibit A, p. 8/10 |
| Protective factors: is future oriented, identifies reason for living, responsibility to family or others and living with family. | Exhibit A, p. 9/10 |
| Appearance: Well groomed. Attitude: **Cooperative and well related.** Behavior: normal rate, rhythm, and volume. Mood: "good." Affect: Supple, normal intensity and appropriate. Thought Process: **Linear, Goal directed.** Thought content: no abnormalities Cognition/ Level of Consciousness: Alert. Oriented to person, place time situation. **Judgement: Intact.** **Impulse Control: Intact** | Exhibit A, p. 9/10 |

74.    The hospital noted several times that Lanit wasn't mentally ill and didn't meet the conditions of being hospitalized in the psych ward; not voluntary or involuntary.

75.    Therefore, what was the reasoning behind keeping Lanit in the psych ward for 3 days? None of the Maimonides paperwork point to a reason why Lanit was held against her will for 3 days.

76.    Exhibit B, Property Sheet is another form of prima facie evidence which shows that the hospital failed to obtain Lanit's signature before removing her property from her forcefully.

18

# VIOLATIONS

**Paramedics: Hatzalah Paramedic Services and Maimonides Paramedic Services Violated Lanit's Right to Refuse Medical Care**

77.     Both Hatzalah Paramedic Services and Maimonides Paramedic Services members forced Lanit to get in the ambulance and applied unnecessary pressure on Lanit to comply.

78.     Both paramedic service members failed to respect Lanit's right to consent to medical procedures.

79.     Both paramedic service members failed to fill out the appropriate forms which are necessary for involuntary paramedic services.

80.     Both paramedic service members failed to respect Lanit's wishes when she declined to be taken to the psych ward for testing. Lanit didn't have a history of mental illness and therefore, the paramedics had no right to force Lanit into psychiatric medical care.

81.     Failure to follow NYCRR 14 § 17.2 and knowingly caused Lanit to miss Family Court. NYCRR 14 § 17.2 states, the written request for an order of transfer shall state or include: (e) The legal admission status of the patient. (1) If the patient is voluntary or informal and is not requesting the transfer, the request shall include his written consent. (2) If the patient is involuntary or non-objecting, the proposed transfer shall be discussed with the patient. No request shall be made by the facility if the patient objects unless he has had the opportunity to appeal the decision to the director. The request shall state that the patient does not object or the result of any appeal.

19

82.    NYCRR 14 § 17.2 also states that, the written request for an order of transfer shall include (f) A statement that no court proceedings are pending involving the patient.

83.    Lanit expressed to the paramedics that she was due in court the following day (December 11, 2018) and the paramedics disregarded this.

**Maimonides Hospital**

**Failed To Evaluate Lanit in The Emergency Room**

84.    When Lanit was brought into the emergency room, she was not seen by a doctor and was not evaluated by a staff MD. Instead, the hospital placed her straight into the overnight observatory room, without being evaluated first.

85.    This is a violation of EMTALA, 42 U.S.C. § 1395dd.

86.    It is also a violation of N.Y. Pub. Health Law § 2805-W, which states, every general hospital shall provide patients who are placed into observation services by such general hospital with an oral and written notice within twenty-four hours of such placement that the patient is not admitted to the hospital and is under observation status. Such written notice shall be signed by the patient or the patient's legal representative to acknowledge receipt.

87.    Lanit wasn't given notice and she wasn't given any information about where Maimonides was placing her.

88.    Dr. Ross Deleonardo was the admitting physician as per the hospitalization paperwork. (Exhibit A, Hosp. Discharge Papers p. 5) Dr. Ross Deleonardo didn't evaluate Lanit, instead he spoke to her parents in the emergency room. He decided to place Lanit in the observation room based on her parents' statements and without ever even speaking to Lanit. He wrote that

the reason for admission is "aggressive behavior." (Exhibit A, Hosp. Discharge Papers p. 5)

### Failed to Give Lanit Her Daily Prescription

89.    Maimonides failed to give Lanit the medication which she takes every day, Adderall. Maimonides was aware that Lanit was on this medication since they asked her about it and since it also came up in her lab-work. (Exhibit A, Hosp. Discharge Papers, p. 7/10)

90.    This medication was clearly not given by Maimonides since it was not included in the list of medications which Lanit was given. (Exhibit A, Hosp. Discharge Papers, p. 5,6/10)

### Lab-Tests Lanit Without Consent

91.    The hospital tested Lanit for things that require written consent. Lanit was tested for drugs without her consent and was also tested for sexually transmitted diseases, like HIV, without her consent. (Exhibit A, Hosp. Discharge Papers p. 6,7)

92.    Provided in NYCRR 14 § 505.6 (a) Except as noted in paragraph (b)(2) of this section, no physician or other person authorized pursuant to law may order an HIV-related test without obtaining written informed consent.

93.    Maimonides failed to obtain written informed consent from Lanit before testing her for sensitive lab-work.

### Disclosed Private Medical Information to Lanit's Family Without Authorization; Violation of HIPAA

94.    Lanit was noted to have capacity. She did not sign an advance directive. (Exhibit A, Hosp. Discharge Papers p. 3)

21

95.    This means that her family wasn't authorized to be involved in her medical care.

96.    Dr. Ross Deleonardo violated HIPAA laws of privacy and breached patient-doctor confidentiality, by speaking to her parents instead of speaking to Lanit in the emergency room.

97.    Dr. Mark Makar violated HIPAA privacy laws several times throughout Lanit's hospitalization.

98.    The first time was when Dr. Makar called Lanit's family without her consent to ask them to come to a meeting in Maimonides on December 11, 2018.

99.    Then Dr. Makar held a meeting with Lanit's family in Maimonides, without Lanit's consent in her absence. The meeting was about Lanit's personal and medical information. Lanit wasn't close to her family and didn't want them involved in her medical business.

100.    After some time, Dr. Makar asked Lanit to join the meeting, which was confusing and surprising for Lanit because she only found out about this meeting she walked into the room. She then had to sit through a meeting in which her family berated her with a stranger present in the room; her parents brought a family friend to the meeting and Lanit wasn't asked if it was ok.

101.    On Lanit's last day, Dr. Makar called her parents to ask them to pick Lanit up from the hospital. Even though Dr. Makar wrote his last note at 11:38pm, Lanit wasn't able to leave the hospital until the late afternoon, when her parents came to pick her up. Lanit wasn't immediately aware that she was waiting to be picked up because Dr. Makar remained vague with her about what she was waiting for. Lanit only lived about 4 blocks from the hospital and was perfectly able to get home by herself. But here again Dr. Makar violated Lanit's

confidentiality by calling her parents and asking them to pick her up—without her consent.

102.    Dr. Makar treated Lanit as if she had no capacity and like her parents had the right to be involved in her medical information. This wasn't true; neither Lanit's documented behavior nor the diagnosis which Dr. Makar gave Lanit ("adjustment disorder") justified Dr. Makar violating Lanit HIPAA rights.

103.    It was inappropriate for Dr. Makar to go about having a family meeting without Lanit even after he met Lanit and noted that she had normal behavior. After seeing that Lanit wasn't mentally ill, Dr. Makar should have allowed Lanit to go home. Asking her family to come was unnecessary and crossing grave boundaries. He validated her parents' abusive behavior by allowing them to berate Lanit. Dr. Makar should be held responsible for each of these HIPAA violations because they were done deliberately.

104.    Lanit was very humiliated, and this was a huge damage to her self-esteem.

105.    As Dr. Makar noted, "several family meetings were held with and without the patient present during which poor family communication can be observed." Dr. Makar should have discharged Lanit as soon as he saw that her family's communication was poor. There wasn't any reason for him holding Lanit for another 2 days after the family meeting on December 11, 2018.

**Caused Lanit to Miss Court Without Reason**

106.    Being held in the hospital involuntarily caused Lanit to miss court. Therefore, this caused Lanit's visitation with her children to be affected. See Exhibit D, Family Court Order 12/10/18. Judge Vargas suspended Lanit's visitation with her children.

23

**Removed Lanit's Property Without Consent; Deprivation of civil rights without due process pursuant to 42 USCS § 1983, illegal seizure of property, false imprisonment**

107.   The hospital took Lanit's property, including her cellphone without obtaining her consent in written format. This is evident from the missing signature on Exhibit B, Property Sheet.

108.   By taking away Lanit's property and cellphone, the hospital was placing Lanit under a false imprisonment which she had no way out of and no way of checking the legitimacy of Maimonides's procedures.

109.   Maimonides failed to meet the due process standards for involuntary hospitalization; 2 psychiatrists or qualified doctors didn't confirm that Lanit met the standards for psychiatric hospitalization. Furthermore, Maimonides only placed a resident, Dr. Makar, and not a psychiatrist, to manage Lanit's hospitalization. Therefore, the civil deprivation of being forced to stay in the psychiatric ward for 3 days is considered an unlawful civil deprivation pursuant to 42 USCS § 1983.

110.   Being that Maimonides failed to meet the due process which would have allowed the hospital to hold Lanit involuntarily in the hospital, Maimonides also did not have a right to remove Lanit's property by force.

**Gave Lanit Anti-Psychotic Medication Negligently Without Providing a Reason**

111.   The hospital gave Lanit anti-psychotic medication without reflecting back to her history and without checking the interactions with any other medications which she took earlier. The nurse simply gave it to her without explanation. This signifies great negligence by the Maimonides staff.

112.   Lanit didn't have a history of taking any anti-psychotic medication.

24

**Caused Lanit to Feel Emotional and Mental Distress**

113.   Being placed in Maimonides against her will caused Lanit great distress and harmed her emotional well-being.

114.   Lanit was accused of being mentally ill yet after 3 days, she was released without further comment on her mental health.

115.   Maimonides should have taken caution before admitting Lanit to see that she needed hospitalization. Making a mistake like this cost Lanit time and damaged her greatly.

**Unsafe Treatment of Patient**

116.   It was unsafe for Maimonides to give Lanit anti-psychotic medication without explanation. Lanit could have reacted badly to the medication, and this could have caused a longer hospital stay.

117.   It was unsafe for Lanit to be placed in the psych ward without a psychiatrist overseeing her hospitalization. Dr. Makar wasn't a psychiatrist, he was only a resident.

118.   It was unsafe for Maimonides to take away all of Lanit's property including her cell phone. This left Lanit very trapped in the psych ward. She could call anyone to help her be removed.

# CAUSE OF ACTION

**Maimonides Hospital**

## COUNT 1
## VIOLATION OF EMTALA, PURSUANT TO 42 USCS § 1395DD

119.   Plaintiff affirms the information stated above in all parts.

120.   Maimonides hospital violated EMTALA laws by failing to evaluate Lanit in the ER and failing to note her resistance to being hospitalized. This violation was done both by the ER Nurse and by Dr. Ross Deleonardo.

121.   EMTALA (d) Enforcement (1) Civil money penalties (A) A participating hospital that negligently violates a requirement of this section is subject to a civil money penalty of not more than $50,000 (or not more than $25,000 in the case of a hospital with less than 100 beds) for each such violation. The provisions of section 1320a-7a of this title (other than subsections (a) and (b)) shall apply to a civil money penalty under this subparagraph in the same manner as such provisions apply with respect to a penalty or proceeding under section 1320a-7a (a) of this title.

## COUNT 2
## VIOLATION OF HIPAA, 42 U.S.C. § 1320D-5

122.   Plaintiff affirms the information stated above in all parts.

123.   The hospital shares the responsibility of their employees failure to comply with HIPAA. Dr. Ross Deleonardo and Dr. Makar both grossly violated Lanit's patient-confidentiality rights as discussed earlier.

124.   Dr. Ross Deleonardo violated HIPAA by failing to evaluate Lanit and instead, speaking to her parents even though Lanit had capacity and he should've spoken to her. He used the illegally obtained information to write a false reason for admission.

*Dr. Makar committed 6 violations of HIPAA by involving Lanit's parents in her medical treatment and private matters when there was no need. He did this without requesting permission from Lanit.*

## COUNT 3
## FAILURE TO PROVIDE SUPERVISION

125.   Plaintiff affirms the information stated above in all parts.

126.    The hospital failed to supervise Dr. Makar as Lanit found out post-hospitalization that he was only a resident.

127.    The hospital failed to provide adequate supervision over the staff. The nurse was able to threaten Lanit and use unnecessary force in getting Lanit to comply. The staff was able to place Lanit under observation before Lanit was evaluated by a doctor. When Lanit complained to staff that she wasn't evaluated by a doctor and that she has court the next day, she was disregarded. The staff were negligent and indifferent to Lanit's needs. The

128.    The hospital's lack of supervision enabled the staff to act unethically, without fearing the consequences. ER Nurse was able to violate Lanit's civil rights and seize her property without following hospital protocol. The OR Nurse administered anti-psychotic medication unethically and endangered Lanit's mental health. An ethical doctor would have questioned the nurse when finding out, but Dr. Makar kept Lanit on the anti-psychotics and didn't question the nurse's reasoning.

129.    The hospital didn't provide adequate supervision on the psych ward floor by qualified psychiatrist doctors. There weren't any psychiatrists supervising the ward.

130.    The only reason Lanit ended up in the psych ward was due to the lack of supervision and lack of strict protocol.

## COUNT 4
## FAILURE TO OBTAIN CONSENT FOR LAB TESTS

131.    Plaintiff affirms the information stated above in all parts.

132.    The hospital failed to obtain consent from Lanit before testing Lanit's lab work for sexually transmitted diseases. As per NYCRR 14 § 505.6, written

consent must be obtained before performing tests for sexually transmitted diseases. The lab tech isn't allowed to perform lab testing for sexually transmitted diseases unless a consent form is attached to the lab work form, confirming the patient's consent. Exhibit F is hospital lab results (with patient-sensitive information blacked out)

133.   NYCRR 14 § 505.6 (a) no physician or other person authorized pursuant to law may order an HIV-related test without obtaining written informed consent (d) A physician or other person authorized pursuant to law to order an HIV-related test shall certify on a laboratory requisition form that written informed consent has been obtained.

## COUNT 5
## FALSE IMPRISONMENT

134.   Plaintiff affirms the information stated above in all parts.

135.   Lanit requested to be discharged and was denied repeatedly. Since Lanit wasn't mentally ill, it was unlawful for the hospital was keeping her detained against her will. The hospital took Lanit's property without due process, including her cell-phone. By taking her cellphone away, the hospital was taking away her ability to reach a party from outside the hospital.

136.   The staff also didn't allow Lanit to walk out of the doors on the 6th floor of the psychiatric ward. When Lanit complained to them, they should have given Lanit a patient representative.

## COUNT 6
## DEPRIVATION OF CIVIL RIGHTS, PURSUANT TO 42 USCS § 1983

137.   Plaintiff affirms the information stated above in all parts.

138.   Lanit's civil rights were severely disregarded and trampled over by the hospital and its employees. The hospital violated Lanit's 4th and 14th amendments several times;

139.   The paramedics forced her to get it the ambulance against her will (Maimonides paramedics are employees of Maimonides Medical Center).

140.   The ER Nurse took Lanit's property without getting her written consent. The ER Nurse took Lanit's property before Lanit was even evaluated by a physician.

141.   The hospital admitted her against her will without a physician evaluating her.

142.   The hospital gave Lanit anti-psychotic drugs without medical reasoning and without giving Lanit any information. Lanit's request was never noted (Lanit requested not to be given anti-psychotic drugs)

143.   The hospital didn't allow Lanit to leave when she asked to be discharged.

144.   Since the hospital failed to fulfill the requirements stipulated by state laws (Mental Hygiene Laws) which would make the hospitalization legal, and Lanit failed to meet the standards of needing psychiatric commitment, the whole hospital stay was a deprivation of Lanit's civil rights. Dr. Makar's notes confirm that the hospitalization was unlawful, "Through continuous observation during the current hospitalization, no sign or symptoms could be attributed to a primary psychiatry pathology." (Exhibit A, p. 8) That means that Lanit wasn't displaying any signs of mental illness and the hospital still kept her in the psych ward, surrounded by mentally ill and dangerous patients.

## COUNT 7
## DEVIATION FROM STANDARD OF CARE

29

145.  Plaintiff affirms the information stated above in all parts.

146.  The hospital failed to determine if Lanit met the standards of psychiatric commitment.

147.  Lanit wasn't seen by a qualified psychiatrist, not even once, throughout her stay at the psych ward. Dr. Makar was a resident who was not certified in mental health and failed to follow the law.

148.  A full clinical assessment was never done on Lanit's mental health. The only time that Lanit was seen by a doctor was on 12/11/18 when she met Dr. Makar along with another male employee and social worker, Megan Reilly, LMSW. This meeting was about 45 minutes long and was not a clinical assessment. Even a physical assessment wasn't done to Lanit, which is a violation of 14 § NYCRR 15.1 (b).

## COUNT 8
## VIOLATIONS/FAILURE TO FOLLOW MENTAL HYGIENE LAWS
## MHL §§ 9.13, 9.15, 9.17, 9.39, 9.40

149.  Plaintiff affirms the information stated above in all parts.

150.  The hospital failed to note that Lanit was an involuntary patient. However, even if the hospital relied on state laws for voluntary admission, the hospital still violated those laws as well.

151.  State law provides that a patient must have a mental illness and must be assessed by a physician to determine if the patient meets the standards for psychiatric commitment. (MHL §§ 9.13, 9.15 and 9.17.)

152.  Since the hospitalization wasn't pre-planned, MHL § 9.27 isn't applicable, as the 2-physician certificate requires for the paperwork to be completed and pre-planned at least 10 days prior to the hospitalization of a

30

patient. Additionally, MHL § 9.37 isn't applicable as well since it is the result of the hospital making a decision about a patient who is brought in but whom a hospital physician believes needs psychiatric care.

153.    MHL §§ 9.39 and 9.40 are both state guidelines for emergency involuntary hospitalizations which apply here. "The director shall admit such person pursuant to the provisions of this section only if a staff physician of the hospital upon examination of such person finds that such person qualifies under the requirements of this section. Such person shall not be retained for a period of more than forty-eight hours unless within such period such finding is confirmed after examination by another physician who shall be a member of the psychiatric staff of the hospital." MHL § 9.39 Emergency admissions for immediate observation, care, and treatment.

154.    MHL § 9.40 pertains to mentally ill patients admitted involuntarily to a Comprehensive Psychiatric Emergency Program. As per MHL § 9.40 (b), "The director shall cause examination of such persons to be initiated by a staff physician of the program as soon as practicable and in any event within six hours after the person is received into the program's emergency room."

155.    As per MHL § 9.40 (d), "If at any time it is determined that the person is no longer in need of immediate observation, care and treatment in accordance with this section and is not in need of involuntary care and treatment in a hospital, such person shall be released without regard to the provisions of section 29.15 of this chapter, unless such person agrees to be admitted to another appropriate hospital as a voluntary or informal patient."

## COUNT 9
## FAILURE TO PROVIDE SAFE ENVIRONMENT
## VIOLATION OF MHL § 33.02, PHL § 2803-C

31

156.   Plaintiff affirms the information stated above in all parts.

157.   The hospital failed to provide Lanit with a safe environment as MHL § 33.02 stipulates.

158.   The hospital failed to respect Lanit's rights which are stipulated by PHL § 2803-C.

159.   Lanit was unsafe due to the hospital's negligence in administering medication, the hospital's lack of proper supervision on the 6th floor ward and the hospital staff's failure to follow procedure.

## COUNT 10
## FAILURE TO USE LEAST RESTRICTIVE METHOD

160.   Plaintiff affirms the information stated above in all parts.

161.   NY Court of Appeals has recognized the right to the least restrictive alternative. (*Kesselbrenner v. Anonymous*, 39 A.D.2d 410, 334 N.Y.S.2d 738, (2d Dep't 1972) rev'd 33 N.Y.2d 161, 350 N.Y.S.2d 889 (1973)

162.   The hospital chose to hospitalize Lanit in the psych ward instead of referring Lanit to a less restrictive medical treatment. Lanit perhaps could have benefited from outpatient therapy. But there is nothing in the hospital paperwork that justifies the hospital's choice of placing Lanit in the psych ward, the most restrictive method. Even worse, the hospital chose the most restrictive method before ever evaluating Lanit.

## COUNT 11
## MEDICAL RECKLESS NEGLIGENCE

163.   Plaintiff affirms the information stated above in all parts.

164.   The staff's negligence was a systematic issue, which the hospital must take responsibility for. Not only were individual staff members and physicians

negligent and indifferent, but staff members which should have exercised supervision failed to hold staff members responsible for their negligence.

165.    Dr. Makar was negligent as to not question the OR Nurse's decision to give Lanit anti-psychotics even though her history didn't include anti-psychotic medications.

166.    In the observation room, several staff members were negligent as to not respect Lanit's requests to be evaluated by a physician even when Lanit expressed that she was due in court the next day.

167.    The hospital failed to provide a second psychiatrist to evaluate Lanit and review Dr. Makar's unqualified medical treatment plan.

## COUNT 12
## FRAUD

168.    Plaintiff affirms the information stated above in all parts.

169.    Both Dr. Ross Deleonardo and Dr. Makar wrote false notes and committed fraud. The hospital is responsible for the fraud that their employees were able to commit simply because of the lack of proper supervision and the lack of proper checks and balances protocols in place.

170.    The reason why their notes are considered fraud is because both doctors allowed Lanit to be held involuntarily and wrote notes which sounded like they are

## COUNT 13
## DEFAMATION

171.    Plaintiff affirms the information stated above in all parts.

172.    The hospitalization and the false notes written about the plaintiff caused the plaintiff defamation. It ruined the plaintiff's credibility in Family

Court and silenced the plaintiff about the crimes she was the victim of, out of fear that others would perceive her complaints as delusions.

**Hatzalah Paramedic Services**

**Maimonides Paramedic Services**

### COUNT 1

### DEPRIVATION OF CIVIL RIGHTS WITHOUT DUE PROCESS GROUNDS FOR ACTION 42 USCS § 1983

173.   Plaintiff affirms the information stated above in all parts.

174.   The Hatzalah members failed to respect the plaintiff's right to resist seizure. The plaintiff did not act as if she had a mental illness as proven in 'Part VII. Paper Trail.'

175.   The paramedics' privilege would only be applicable if they acted in good faith and followed due process. Here, both can be proven to be lacking: Lanit did not act dangerous, and she didn't behave as if she had a mental illness, as the hospitalization papers prove[8]. Additionally, the paramedics failed to fill out the medical forms stipulated by the Office of Mental Health[9].

176.   The paramedics were using their power to force Lanit into their ambulance even though she didn't need treatment, without following the requirements of their actions.

177.   Hatzalah paramedics are ultimately the cause of Lanit being taken to the ER.

### COUNT 2

### HARASSMENT

---

[8] Hospital paperwork shows Lanit had capacity.
[9] OMH Form 474/476, OMH Form 482

178.   Plaintiff affirms the information stated above in all parts.

179.   The Hatzalah paramedics stayed in Lanit's parents' home for over an hour. They were aggressive and surrounded Lanit in a hostile manner.

180.   When the Hatzalah paramedics' tactics didn't work, they called Maimonides paramedics for "backup." If they believed the plaintiff needed psychiatric care, they should have brought a qualified mental health professional who has the right to make the call of whether the plaintiff needed psychiatric hospitalization or not, and then obtained a court order to lawfully hospitalize the plaintiff.

181.   Instead, the Hatzalah paramedics used unnecessary force and excessive intimidation to try to force Lanit into compliance. Lanit didn't need to comply; she wasn't mentally ill.

182.   The paramedics were extremely out of line and crossed boundaries by using unnecessary force. They caused Lanit to panic.

183.   The paramedics didn't have the right to force Lanit to do anything. Paramedics have no right to walk into a house and accuse a person of needing hospitalization without evaluating them. That's exactly what they did to Lanit.

## COUNT 3
## VIOLATION OF MHL §§ 9.39, 9.40 AND 9.55

184.   Plaintiff affirms the information stated above in all parts.

185.   The paramedics failed to follow MHL § 9.55, which stipulates that only a qualified mental health professional can forcefully order a mentally ill person to be transported to the hospital involuntarily.

186.   The Hatzalah paramedics failed to follow MHL § 9.39, 9.40, which states that a person must be mentally ill (certificate that claims the patient has mental illness) and dangerous, which Lanit was neither. "In order to constitutionally seize a person to transport him to a hospital, the person must be dangerous, presumably to himself or others. For a competent adult, dangerousness to oneself justifying such a seizure does not include a refusal to accept medical treatment." See Glass v. Mayas, 984 F.2d 55 (2d Cir.1993)

## COUNT 4
## FAILURE TO PERFORM DUTY; DEVIATION FROM STANDARD

187.   Plaintiff affirms the information stated above in all parts.

188.   The paramedics failed to evaluate Lanit before claiming that they were obligated to take her to the hospital. They should have evaluated her first and then if they thought that she needed hospitalization, they should have asked a qualified professional to execute a court request and a court order. Since no evaluation was done and none was documented using OHM Forms, the Hatzalah paramedics' actions can't be considered done in good faith.

## COUNT 5
## INFLICTION OF EMOTIONAL DURESS AND HARASSMENT

189.   Plaintiff affirms the information stated above in all parts.

190.   The Maimonides paramedics came to Lanit's parents' home with a police officer accompanying them. This was a form of nonverbal intimidation the paramedics used to force Lanit into compliance, even though she had the right to resist.

191.   To bring a police officer is also abuse of power and a misuse of police force. It made Lanit feel like she was breaking the law by refusing to comply, even though she was within her rights of doing so.

## COUNT 6
## MISREPRESENTATION OF THE LAW

192.   Plaintiff affirms the information stated above in all parts.

193.   The paramedics incorrectly asserted that they were obligated to bring Lanit in and that Lanit was obligated to listen. They manipulated Lanit into thinking she was breaking a law by refusing to get inside their ambulance.

# DEMAND FOR RELIEF

**For Defendant Hatzalah Paramedic Services;**

194.   For violating the plaintiff's civil right to resist, harassment and infliction of emotional duress, using unnecessary force, making untrue assertions about the plaintiff's obligation to comply and ultimately causing the plaintiff's unlawful seizure, violations and misconduct pursuant to 42 USCS § 1983 Deprivation of Civil Rights which took place on December 10, 2018, the plaintiff is requesting punitive damages of $250,000 and compensatory and special damages in the amount that the court believes is appropriate.

**For Defendant Maimonides Paramedics Services;**

195.   For the unlawful seizure on December 10, 2018, harassment and infliction of emotional duress, unnecessary force, misrepresentation of the law, failure to satisfy due process, misuse of a police officer, and violating MHL § 9.55, pursuant to 42 USCS § 42 USCS § 1983 Deprivation of Civil Rights, the plaintiff requests punitive damages of $400,000 and compensatory and special damages in the amount that the court believes is appropriate.

**For Defendant Maimonides Hospital;**

196.    For the unlawful hospitalization between the dates of December 10, 2018 until December 13, 2018, false imprisonment, EMTALA violation, several HIPAA violations, deviation from standards, failure to supervise, failure to ensure a safe environment, failure to prove a qualified psychiatrist, unconsented lab testing, violations of Mental Health Laws, defamation, fraud and civil deprivation pursuant to 42 USCS § 1983 Deprivation of Civil Rights, the plaintiff requests punitive damages of $3,500,000 and compensatory and special damages in the amount that the court believes is appropriate.

# EXHIBIT LIST

**Exhibit A**                    Dec 10, 2018

Maimonides Hosp. Discharge Papers

**Exhibit B**                    Dec 10, 2018

Maimonides Hosp. Property Sheet

**Exhibit C**                    Dec 10, 2018

Maimonides Hosp. MRI Results

**Exhibit D**                    Dec 11, 2018

Family Court Order, Judge Vargas

**Exhibit E**                    Oct 19, 2018

Therapist Statement—Rivkah Kaufman, LCSW

**Exhibit F**                    Dec 10, 2018

Lab Tests Results

**Exhibit G**                    June 3, 2019

Therapist Statement –Yerachmiel Stern, LCSW

**Exhibit H**

Maimonides Bill

**Exhibit I**                    August 4, 2020

Fidelis Explanation of Benefits (EOB)

~~Exhibit J~~

~~NPI Registry for Dr. Mark Makar~~

# EXHIBIT A



**Maimonides Medical Center**
4802 Tenth Avenue
Brooklyn, NY 11219
718.283.6000

Brooklyn NY 11219

*Discharge Summary Psych*

| | | |
|---|---|---|
| **AMIRA, LANIT** | 90541572 / 502325346 | **DOB: Jun-23-1989**   **Age: 29y** |
| **NE4-N410-02** | **Admit Date: Dec-10-2018** | **Provider: DELEONARDO, ROSS  F** |

**BEHAVIORAL INFORMATION:**

## Patient Disposition Location Income

Your (Patient's) home address is listed as :
830 46TH ST
  BROOKLYN, New York 11220

### You are being discharged to:
You are being discharged home.

### Patient Disposition Location Income:
Upon leaving the hospital, you will be staying at (name/address): same as above. You can be reached after discharge at telephone 732-328-0380.

The source of income for the patient is/will be: Pt is supported by her family at this time; she is motivated to work.

### Support Systems Available:
**Relationship Status**          separated
**Social Support from**          friends

### Behavioral Health Appointment 1:
Clinic Name, Address & Phone Number: CMHC AOS,    920 48th Street,   Brooklyn, NY 11219.    Phone: (718)283-7800.

Provider's Name: Svetlana R., Social Worker.

An appointment was scheduled for you on Dec-14-2018 at 09:00 AM.

### Behavioral Health Follow Appointments:
Appointments were made.

At time of discharge, the Discharge Summary/Transition Record has been sent to the next provider via delivered in person.

Discharge Summary/Transition Record sent to next provider on Dec-11-2018 12:00.

### PATIENT DISCHARGE INSTRUCTIONS:
### Advanced Directives:
• **Advanced Directive**                NO Surrogate Decision Maker Designated AND NO
                                          Advanced Directive Completed
• **Reason For No Advanced Directive**   Patient Refused But Information Provided

### Medication Authorization:
Prior authorization for medication Not Applicable.

 Maimonides
Medical Center

Brooklyn NY 11219

**Maimonides Medical Center**
**4802 Tenth Avenue**
**Brooklyn, NY 11219**
**718.283.6000**

### *Discharge Summary Psych*

| | | | |
|---|---|---|---|
| **AMIRA, LANIT** | **90541572 / 502325346** | **DOB: Jun-23-1989** | **Age: 29y** |
| **NE4-N410-02** | **Admit Date: Dec-10-2018** | **Provider: DELEONARDO, ROSS  F** | |

Medications at discharge Not Applicable.

THESE ARE THE ONLY MEDICATIONS AND INSTRUCTIONS TO FOLLOW POST DISCHARGE:
*\* No Current Medications as of Dec-13-2018 11:14 documented in Structured Notes*

Prescriptions:
• **Prescriptions submitted electronically**
  **and/or printed**

## The  Following Medication were sent Electronically to your Pharmacy

No medication entered!

## Printed Medications

No medication entered!

Allergy:

| Category | Allergen Type | Allergen/Product | Reaction |
|---|---|---|---|
| Allergies | NK Drug Allergy | **NK Drug** | Unknown |
| Allergies | NK LatexAllergy | **NK Latex** | Unknown |
| Allergies | NK Food Allergy | **NK Food** | Unknown |
| Allergies | NK Env. Allergy | **NK Environmental** | Unknown |

**Substance Use - Smoking Counseling:**
**Smoking Status**                        current every day smoker

**YOUR REASON FOR BEING IN THE HOSPITAL:**
You were in the hospital because agitation at home.

The medical word for your condition is Adjustment disorder.

You also have these health conditions: Hemorrhoids.

**Post Hospital Diet and Activity:**
Diet: Regular.

Level of activity: as tolerated.

**YOU SHOULD CONTACT YOUR DOCTOR FOR THE FOLLOWING:**
feeling more anxious than usual; feeling more confused than usual; feeling more depressed than usual; feeling more irritable than usual; having new medication side effects; having thoughts of drinking or using drugs again; having thoughts of harming others; having thoughts of harming yourself; hearing more voices than usual; not


Maimonides
Medical Center

Brooklyn NY 11219

**Maimonides Medical Center**
**4802 Tenth Avenue**
**Brooklyn, NY 11219**
**718.283.6000**

### Discharge Summary Psych

| AMIRA, LANIT | 90541572 / 502325346 | DOB: Jun-23-1989 | Age: 29y |
|---|---|---|---|
| NE4-N410-02 | Admit Date: Dec-10-2018 | Provider: DELEONARDO, ROSS  F | |

being able to sleep at night . If you cannot reach your doctor and your symptoms persist or are getting worse, call 911.

**Emergency Contact:**
• **Emergency Phone Numbers**     MAIMONIDES MEDICAL CENTER EMERGENCY
ROOM : 718-283-1404
CRISIS HOTLINE: 800-LIFENET (800-543-3638)
N4 NURSING UNIT : 718-283-7850
N6 NURSING UNIT : 718-283-8492

**Care Providers:**
**DELEONARDO, ROSS STANLEY**(Attending):
**DELEONARDO, ROSS STANLEY**(Admitting):
**DELEONARDO, ROSS STANLEY**(Referring):
**Teitelbaum, Jeffrey**(Primary Care): General Pediatrics

**PHYSICIAN DISCHARGE SUMMARY:**
**Reason for Admission:**
**Reason for Admission**          Aggressive behavior

**Prior Mental Hlth Services Prior Inpt Stay:**
Past Psychiatric Hospitalizations: has never been hospitalized in Psychiatry.

Current Outpatient Therapy: psychotherapy and medication management.

Past Outpatient Therapy: medication management.

**Functional Cognitive Status:**

**Functional Cognitive Status:**
**Hearing Status**                normal hearing
**Vision Status**                 normal vision with corrective lenses
**Cognition**                     normal cognition
**Ambulation**                    normal ambulation
**Activities of Daily Living**    normal ADLs
**Independent Activities**        no difficulty doing errands alone

**All Health Issues except Discharge Dx:**
  **Chief Complaint:**
    Other general examinations: Status: Active
  **Surgical Hx:**
    Hemorrhoidectomy involving two or more anal columns: Status: Active
    Transanal dearterialization of hemorrhoid with ultrasound guidance: Status: Active

I have reviewed and completed the Discharge Diagnosis.

**PRN Medications During this Psych Admission:**
**PRN Medications given during stay**     Benadryl 50 mg, Thorazine 50 mg, Ativan 1 mg and

 Maimonides
Medical Center

Brooklyn NY 11219

**Maimonides Medical Center**
4802 Tenth Avenue
Brooklyn, NY 11219
718.283.6000

*Discharge Summary Psych*

| AMIRA, LANIT | 90541572 / 502325346 | DOB: Jun-23-1989     Age: 29y |
|---|---|---|
| NE4-N410-02 | Admit Date: Dec-10-2018 | Provider: DELEONARDO, ROSS  F |

Atarax 25 mg.

**Lab and Microbiology Results - All Results:**
**General Chemistry:**
Dec-10-2018 19:06 Alcohol Level, Serum

| Result | Value | Abn | Range |
|---|---|---|---|
| Alcohol Level, Serum | <10 | | [ - <10 mg/dL] |

Dec-10-2018 19:06 Basic Metabolic Panel

| Result | Value | Abn | Range |
|---|---|---|---|
| Sodium, Serum | 140 | | [135 - 149 MMOL/L] |
| Potassium, Serum | 3.8 | | [3.4 - 4.8 MMOL/L] |
| Chloride, Serum | 105 | | [93 - 105 MMOL/L] |
| CO2, Serum | 26 | | [23 - 32 MMOL/L] |
| Glucose, Random | 89 | | [59 - 140 MG/DL] |
| BUN, Serum | 12 | | [7 - 21 MG/DL] |
| Creatinine, Serum | 0.8 | | [0.3 - 1.1 mg/dL] |
| Calcium, Serum | 9.1 | | [8.2 - 10.1 MG/DL] |
| Anion Gap, Serum | 9.0 | | [3 - 11 MMol/L] |

Dec-10-2018 19:06 Liver Profile

| Result | Value | Abn | Range |
|---|---|---|---|
| Albumin, Serum | 4.2 | | [3.5 - 5.2 G/DL] |
| Bilirubin, Total | 0.7 | | [0.2 - 1.4 MG/DL] |
| Bilirubin, Direct | 0.1 | | [0.0 - 0.2 MG/DL] |
| AST, Serum | 16 | | [10 - 33 IU/L] |
| Alkaline Phosphatase, Serum | 51 | | [36 - 112 IU/L] |
| ALT, Serum | 14 | | [6 - 47 IU/L] |
| Total Protein, Serum | 6.7 | | [5.6 - 7.6 G/DL] |

Dec-10-2018 19:06 Total BHCG 5th

| Result | Value | Abn | Range |
|---|---|---|---|
| Total BHCG 5th | <0.5 | | [ - <5.0 MIU/ML] |

Dec-10-2018 19:06 TSH, Serum

| Result | Value | Abn | Range |
|---|---|---|---|
| TSH, Serum | 0.98 | | [0.39 - 4.08 MCIU/ML] |

Dec-12-2018 08:55 HIV-1/2 EIA, SCR W/RFL

| Result | Value | Abn | Range |
|---|---|---|---|
| HIV 1/2 EIA | | | [NR] |



Maimonides Medical Center

Brooklyn NY 11219

**Maimonides Medical Center**
**4802 Tenth Avenue**
**Brooklyn, NY 11219**
**718.283.6000**

### *Discharge Summary Psych*

| AMIRA, LANIT | 90541572 / 502325346 | DOB: Jun-23-1989    Age: 29y |
|---|---|---|
| NE4-N410-02 | Admit Date: Dec-10-2018 | Provider: DELEONARDO, ROSS  F |

General Hematology:
Dec-10-2018 19:06 CBC with Differential

| Result | Value | Abn | Range |
|---|---|---|---|
| WBC | 6.9 | | [4.8 - 10.8 K/UL] |
| RBC | 3.77 | ↓ | [4.20 - 5.40 M/UL] |
| HGB | 12.1 | | [12.0 - 16.0 GM/DL] |
| HCT | 35.3 | ↓ | [37.0 - 47.0 %] |
| MCV | 93.6 | | [81.0 - 99.0 FL] |
| MCH | 32.1 | ↑ | [27.0 - 31.0 PG] |
| MCHC | 34.3 | | [33.0 - 37.0 %] |
| RDW | 11.9 | | [11.4 - 16.4 %] |
| Platelet Count | 225 | | [150 - 400 K/uL] |
| Diff Type | | | |
| Neutrophil Count | 57.1 | | [37.9 - 70.5 %] |
| Lymphocyte Count | 35.1 | | [19.8 - 47.7 %] |
| Monocyte Count | 6.2 | | [2.7 - 11.7 %] |
| Eosinophil Count | 0.9 | | [0.3 - 5.9 %] |
| Basophil Count | 0.3 | | [0.1 - 2.4 %] |
| Imm Granulocyte % | 0.4 | | [ %] |
| ABS Neutrophils | 4.0 | | [1.4 - 6.5 K/UL] |
| ABS Lymph | 2.4 | | [1.2 - 3.4 K/UL] |
| ABS Monocytes | 0.4 | | [0.2 - 0.5 K/UL] |
| ABS EOS | 0.1 | | [0 - 0.5 K/UL] |
| ABS BASO | 0.0 | | [0 - 0.2 K/UL] |
| ABS Imm Granulocyte | 0.0 | | [0.0 - 0.06 K/UL] |

Non-Blood:
Dec-10-2018 19:06 Toxicology, Urine Random

| Result | Value | Abn | Range |
|---|---|---|---|
| Barbiturate Urine | NEGATIVE | | [NEG ng/ml] |
| Benzodiazepine Urine | NEGATIVE | | [NEG ng/mL] |
| Cocaine Urine | NEGATIVE | | [NEG ng/mL] |
| Cannabinoids Urine | POSITIVE | H | [NEG ng/mL] |
| Methadone Metabolites Urine | NEGATIVE | | [NEG ng/mL] |
| Opiate Urine | NEGATIVE | | [NEG ng/mL] |
| Phencyclidine Urine | NEGATIVE | | [NEG ng/mL] |
| Amphetamine and Methamphet Level, | POSITIVE | H | [NEG ng/mL] |



**Maimonides** Medical Center
Brooklyn NY 11219

**Maimonides Medical Center**
**4802 Tenth Avenue**
**Brooklyn, NY 11219**
**718.283.6000**

### Discharge Summary Psych

| AMIRA, LANIT | 90541572 / 502325346 | DOB: Jun-23-1989 | Age: 29y |
|---|---|---|---|
| NE4-N410-02 | Admit Date: Dec-10-2018 | Provider: DELEONARDO, ROSS  F | |

Urine

**General Serology:**
**Dec-12-2018 08:55 Treponemal AB with Reflex RPR**

| Result | Value | Abn | Range |
|---|---|---|---|
| Treponemal AB Test | Negative | | [Negative] |

• **Hospital Course**

Amira Lanit is a 29 yo female with a past medical history of constipation and hemorrhoids and a past psychiatric history of ADHD. She was BIBA after reported threatening statements at home. The patient denied any hallucinations, suicidal or homicidal ideation but is concerned that her boss and husband are spying on her and are following her. She also complained of depressed mood which was triggered by recent divorce and loss of her children's custody. She remained linear and goal directed through the entire interview and responded appropriately when these believes are challenged. Her family reported that some of her claims might be justified but they believed that she was more agitated and aggressive and more paranoid than her usual self.
Through continuos observation during the current hospitalizations, no signs or symptoms could be attributed to a primary psychiatric pathology. MRI and lab work is negative. Several family meeting were held with and without the patient present during which poor family communication can be observed. Given the recent change in living environment and the ongoing stressors, would recommend ongoing outpatient therapy. No home medications prescribed during current admission. -

**Plan of Care:**
**Plan of Care**

Problem: Acute Psychiatric Stay
Goal: Patient will keep oupatient psychiatric care visits,
continue to take medications as prescribed and consult with their psychiatrist before making changes to medications.
Instructions: See Patient Discharge Instruction Note

**Risk for Self-Harm or Suicide:**
Within The Last 6 Months Beyond The Last 6 Months.


Maimonides
Medical Center
Brooklyn NY 11219

**Maimonides Medical Center**
**4802 Tenth Avenue**
**Brooklyn, NY 11219**
**718.283.6000**

### Discharge Summary Psych

| | | | |
|---|---|---|---|
| **AMIRA, LANIT** | **90541572 / 502325346** | **DOB: Jun-23-1989** | **Age: 29y** |
| **NE4-N410-02** | **Admit Date: Dec-10-2018** | **Provider: DELEONARDO, ROSS  F** | |

Self-Harm/Suicide: denies any suicidal/homicidal ideation or self-injurious behavior.

Recent Events Which May Increase Risk: Her ongoing divorce process and losing the custody of her children. and end of relationship.

Clinical Status: substance use.

Treatment: is compliant with treatment.

Protective Factors: is future oriented, identifies reason for living, responsibility to family or others and living with family.

**Risk for Violence:**
Within The Last 6 Months Beyond The Last 6 Months.

Primary Predictors of Violence: has history of violence and has history of substance abuse.

Potential Predicators: no identified predictors of violence.

Protective Factor: Patient is compliance with treatment.

**Self Care:**
Patient's ability to care for self in the community is: Good.

**Mental Status Exam:**
Appearance: Well groomed. Attitude: Cooperative and Well related. Behavior: Normal. Speech: Normal rate, rhythm and volume. Mood: "good". Affect: Supple, Normal intensity and Appropriate.

Thought process: Linear Goal directed. Thought Content has: no abnormalities.

Suicidal and Homicidal Ideation: Denies Suicidal Ideation, Active Homicidal or Passive Homicidal Ideation.

Perception: Denies any perceptual disturbances.

Cognition: Level of Consciousness: Alert. Oriented to: person, place, time, situation. Attention: Intact. Immediate Recall: Intact. Short- term Recall: Intact. Long-term Recall: Intact.

Insight: Recognizes the presence of psychiatric illness and Recognizes need for treatment. Judgment: Intact. Impulse Control: Intact.

**Recommendations for Next Provider:**
The patient was instructed to make all follow up visits for outpatient psychiatric care, continue to take psychiatric medications as prescribed, and that any changes to their medications should be made in consultation with the patient's psychiatrist.

**Discharge Order:**



 Maimonides
Medical Center

Brooklyn NY 11219

**Maimonides Medical Center**
**4802 Tenth Avenue**
**Brooklyn, NY 11219**
**718.283.6000**

### Discharge Summary Psych

| AMIRA, LANIT | 90541572 / 502325346 | DOB: Jun-23-1989 | Age: 29y |
| NE4-N410-02 | Admit Date: Dec-10-2018 | Provider: DELEONARDO, ROSS F | |

| Date | Order Name | Order Summary Line | |
| --- | --- | --- | --- |
| Dec-13-2018 | Discharge Today | Discharge Date: Dec-13-2018 | |

The physician portion of the discharge instructions is now complete. It is now ready for nursing completion.

**Electronic Signatures:**
**Makar, Mark (MBCHB)** (Signed Dec-13-2018 11:38)
    *Authored: PATIENT DISCHARGE INSTRUCTIONS, PHYSICIAN DISCHARGE SUMMARY*
**Reilly, Megan (LMSW)** (Signed Dec-11-2018 12:47)
    *Authored: BEHAVIORAL INFORMATION, PATIENT DISCHARGE INSTRUCTIONS, PHYSICIAN*
    *DISCHARGE SUMMARY*

*Last Updated: Dec-13-2018 11:38 by Makar, Mark (MBCHB)*

# EXHIBIT B



**ATTENDING PHYSICIAN**
**YASSIR MAHGOUB**

**Maimonides**
Medical Center
Brooklyn, NY 11219

AMIRA, LANIT
90541572      502325346      PS4
06/23/1989      F      12/10/2018

DEPARTMENT OF PSYCHIATRY

# PROPERTY SHEET

The items listed below are an accurate accounting of my money and property given to the nursing staff for storage during hospitalization.

Patient (or Guardian / Representative): _____    _____
                                        Signature indicates agreement with list    Relationship to patient

*Note: Please list dentures, hearing aids and eyeglasses on the Initial Nursing History and Assessment form.*

## Items Deposited in Unit Safe

| Money | Jewelry | Other |
|-------|---------|-------|
|       |         |       |
|       |         |       |
|       |         |       |
|       |         |       |
|       |         |       |

## Miscellaneous Items Stored in Unit Closet / Lockers

## Money or other items returned to patient during course of hospitalization

| Date | Money or Item | Staff Member |
|------|---------------|--------------|
|      |               |              |
|      |               |              |
|      |               |              |
|      |               |              |

Staff Member Receiving Patient's Property: _____

## RETURN OF PROPERTY TO PATIENT UPON DISCHARGE

The items above have been returned to me: _____
                                          Patient's (or Guradian / Representative) Signature

Staff member returning items to patient: _____    ___/___/___
                                                                          Date

**Patient on Discharge**



# EXHIBIT C



**Maimonides**
Medical Center

**Brooklyn, NY 11219**

PATIENT NAME: AMIRA,LANIT
MED REC #: 90541572
ACCOUNT NUMBER: 502325346
DATE OF BIRTH: 06/23/1989

**FINAL REPORT**
DATE OF EXAM: Dec 12 2018
Reason for Exam: First break psychosis
MRI - 0016 MR BRAIN w/wo IV CONTRAST   Accession Number: 5756652
Requested by:       MARK MAKAR
CONTRAST USED:  10 mL  DOTAREM
MR BRAIN w/wo IV CONTRAST : 12/12/2018 11:14 AM
Accession#(s): 5756652
CLINICAL STATEMENT:  29 years old Female with a clinical history of
psychosis.

TECHNIQUE:
MR Images of the head without and with intravenous gadolinium using
multiplanar multisequential imaging.

CONTRAST:
10 mL Dotarem

COMPARISON: No prior studies are available.

FINDINGS:
The ventricles, cisterns and sulci are within normal limits for age.
There is no intraparenchymal mass.
There is no abnormal intraparenchymal signal.

After the intravenous administration of contrast, expected vascular
enhancement is demonstrated.  No abnormal enhancement is seen.
Gray-white differentiation is maintained and there is no restricted
diffusion to suggest an acute infarct.
There is no extra-axial fluid collection.
There is no abnormal susceptibility demonstrated.
The sella and suprasellar regions demonstrate no mass or abnormality.
The craniocervical junction is within normal limits.
The cerebello-pontine angles are grossly unremarkable.
Normal flow voids are maintained in the major arterial and venous
structures at the skull base.
The visualized  paranasal sinuses, orbits, and mastoid air cells are

Insert Chart Confidentiality Message



**Maimonides**
Medical Center

**Brooklyn, NY 11219**

**PATIENT NAME: AMIRA,LANIT**
**MED REC #: 90541572**
**ACCOUNT NUMBER: 502325346**
**DATE OF BIRTH: 06/23/1989**
unremarkable.

IMPRESSION:

NO ACUTE INFARCT.
NO MASS.
NO ABNORMAL SIGNAL OR ENHANCEMENT.

****END OF REPORT****

Read By: EVAN STEIN on Dec 12 2018 12:55P
Electronically Signed by:   EVAN STEIN on Dec 12 2018 12:56P

Signing Physician: STEIN, EVAN

Insert Chart Confidentiality Message

Case started when I went to fc for a restr. order $20\overset{..}{\lambda}$
1st lim then full
My husband was

# EXHIBIT D

At a term of the Family Court of the
State of New York, held in and for
the County of Kings, at 330 Jay
Street, Brooklyn, NY 11201, on
December 11, 2018

**PRESENT:**    Hon. Javier E. Vargas

In the Matter of a **Custody/Visitation** Proceeding

**Lanit Amira,**

Petitioner,

- against -

**Eliyahu Amira,**

Respondent.

**File #:**    267285
**Docket #:**    V-30170-18
V-30171-18
V-19612-18
V-19611-18

**ORDER**

PURSUANT TO SECTION 1113 OF THE FAMILY COURT ACT, AN APPEAL FROM THIS
ORDER MUST BE TAKEN WITHIN 30 DAYS OF RECEIPT OF THE ORDER BY APPELLANT
IN COURT, 35 DAYS FROM THE DATE OF MAILING OF THE ORDER TO APPELLANT BY
THE CLERK OF COURT, OR 30 DAYS AFTER SERVICE BY A PARTY OR THE ATTORNEY
FOR THE CHILD UPON THE APPELLANT, WHICHEVER IS EARLIEST.

IT IS ORDERED that **the mother, Lanit Amira's visitation with the subject children,
Ben Amira (D.O.B. 02/10/2013) and Chananel Amira (D.O.B. 02/04/2016) is hereby
SUSPENDED until she is psychologically cleared to do so.**

Dated: December 11, 2018                    **ENTER**

20181211154805JVARGASA941E2D2C727404C89DD48F907F5F60C

Hon. Javier E. Vargas

Check applicable box:
☐ Order mailed on [specify date(s) and to whom mailed]:_____
☐ Order received in court on [specify date(s) and to whom given]:_____

F.C.A §§ 430, 550, 655, 828, 1029

GF5 12/2013

ORI No:      NY023023J
Order No:    2018-032345
NYSID No:    _____

At a term of the Family Court of the State of New York,
held in and for the County of Kings, at 330 Jay Street, Brooklyn, NY
11201, on December 11, 2018

PRESENT: Honorable Javier E. Vargas

In the Matter of a FAMILY OFFENSE Proceeding

Eliyahu Amira (DOB: 01/30/1984),
                          Petitioner

            - against -

Lanit Amira (DOB: 06/23/1989),
                          Respondent

File #      267285

Docket #    O-18451-18

**Temporary Order of Protection**

**Ex Parte**

NOTICE: YOUR FAILURE TO OBEY THIS ORDER MAY SUBJECT YOU TO MANDATORY ARREST AND CRIMINAL PROSECUTION, WHICH MAY RESULT IN YOUR INCARCERATION FOR UP TO SEVEN YEARS FOR CRIMINAL CONTEMPT, AND/OR MAY SUBJECT YOU TO FAMILY COURT PROSECUTION AND INCARCERATION FOR UP TO SIX MONTHS FOR CONTEMPT OF COURT. IF YOU FAIL TO APPEAR IN COURT WHEN YOU ARE REQUIRED TO DO SO, THIS ORDER MAY BE EXTENDED IN YOUR ABSENCE AND THEN CONTINUES IN EFFECT UNTIL A NEW DATE SET BY THE COURT.

THIS ORDER OF PROTECTION WILL REMAIN IN EFFECT EVEN IF THE PROTECTED PARTY HAS, OR CONSENTS TO HAVE, CONTACT OR COMMUNICATION WITH THE PARTY AGAINST WHOM THE ORDER IS ISSUED. THIS ORDER OF PROTECTION CAN ONLY BE MODIFIED OR TERMINATED BY THE COURT. THE PROTECTED PARTY CANNOT BE HELD TO VIOLATE THIS ORDER NOR BE ARRESTED FOR VIOLATING THIS ORDER.

A petition under Article 8 of the Family Court Act, having been filed on July 20, 2018 in this Court and good cause having been shown, and Lanit Amira having been not present in Court.

NOW, THEREFORE, IT IS HEREBY ORDERED that Lanit Amira (DOB:06/23/1989) observe the following conditions of behavior:

[01] Stay away from:

[A]  Ben Amira (DOB: 02/10/2013), Chananel Amira (DOB: 02/04/2016) and Eliyahu Amira (DOB: 01/30/1984) wherever they may be;

[B]  the home of Ben Amira (DOB: 02/10/2013), Chananel Amira (DOB: 02/04/2016) and Eliyahu Amira (DOB: 01/30/1984) at 2003 Avenue J Apt. 4F, Brooklyn, NY 11210 respondent is excluded from the premises;

[C]  the school of Ben Amira (DOB: 02/10/2013) and Chananel Amira (DOB: 02/04/2016) their camps, and bus stops;

[02] Refrain from assault, stalking, harassment, aggravated harassment, menacing, reckless endangerment, strangulation, criminal obstruction of breathing or circulation, disorderly conduct, criminal mischief, sexual abuse, sexual misconduct, forcible touching, intimidation, threats, identity theft, grand larceny, coercion or any criminal offense against Ben Amira (DOB: 02/10/2013), Chananel Amira (DOB: 02/04/2016) and Eliyahu Amira (DOB: 01/30/1984);

[99] Observe such other conditions as are necessary to further the purposes of protection: this order is subject to mutually agreed or Court ordered supervised visitation as per Family or Supreme Court orders;

[99] Observe such other conditions as are necessary to further the purposes of protection: the respondent is not to interfere with the father's care and custody of the children;

GF-5 Page 2
O-18451-18
2018-032345

**It is further ordered** that this temporary order of protection shall remain in force until and including February 07, 2019, but if you fail to appear in court on this date, the order may be extended and continue in effect until a new date set by the Court.

Dated:    December 11, 2018                                     ENTER



2018121115143A4JVANGA9AB54739DEEE8995B2429FA9140BECB9

Honorable Javier E. Vargas

PURSUANT TO SECTION 1113 OF THE FAMILY COURT ACT, AN APPEAL FROM THIS ORDER MUST BE TAKEN WITHIN 30 DAYS OF RECEIPT OF THE ORDER BY APPELLANT IN COURT, 35 DAYS FROM THE DATE OF MAILING OF THE ORDER TO APPELLANT BY THE CLERK OF COURT, OR 30 DAYS AFTER SERVICE BY A PARTY OR THE ATTORNEY FOR THE CHILD UPON THE APPELLANT, WHICHEVER IS EARLIEST.

**The Family Court Act** provides that presentation of a copy of this order of protection to any police officer or peace officer acting pursuant to his or her special duties authorizes, and sometimes requires such officer to arrest a person who is alleged to have violated its terms and to bring him or her before the court to face penalties authorized by law.

**Federal law requires** that this order is effective outside, as well as inside, New York State. It must be honored and enforced by state and tribal courts, including courts of a state, the District of Columbia, a commonwealth, territory or possession of the United States, if the person restrained by the order is an intimate partner of the protected party and has or will be afforded reasonable notice and opportunity to be heard in accordance with state law sufficient to protect due process rights (18 U.S.C §§ 2265, 2266).

**It is a federal crime to:**
• cross state lines to violate this order or to stalk, harass or commit domestic violence against an intimate partner or family member;
• buy, possess or transfer a handgun, rifle, shotgun or other firearm or ammunition while this Order remains in effect (Note: there is a limited exception for military or law enforcement officers but only while they are on duty) ; and
• buy, possess or transfer a handgun, rifle, shotgun or other firearm or ammunition after a conviction of a domestic violence-related crime involving the use or attempted use of physical force or a deadly weapon against an intimate partner or family member, even after this Order has expired (18 U.S.C. §§ 922(g)(8), 922(g)(9), 2261, 2261A, 2262).

Check Applicable Box(es):

[ ]  Party against whom order was issued was advised in Court of issuance and contents of Order

[ ]  Order personally served in Court upon party against whom order was issued

[x]  Service directed by other means: Mail

[x]  [Modifications or extensions only]: Order mailed on [specify date and to whom mailed]:

[ ]  Warrant issued for party against whom order was issued[specify date]: _____

[ ]  ADDITIONAL SERVICE INFORMATION [specify]: _____

# EXHIBIT E



**RK CONNECTIONS**
**RIVKAH KAUFMAN, MS. ED, LMHC**
**PSYCHOTHERAPY AND COUNSELING SERVICES**
**115 HENRY STREET, SUITE 1F, BROOKLYN, NY 11201**
**EMAIL: RIVKAH.KAUFMAN@GMAIL.COM**
**PHONE: 917-803-5871**
**FAX: 917-979-6313**

**October 19, 2018**

**To Whom it May Concern:**

In the 4 months since I began working with Lanit Amira, on 6/6/18, I have found her well-spoken, devoted to her children and devastated at her removal from their lives. I have also found Mrs. Amira receptive to both therapeutic strategies and skills, as well as my suggestion that she meet with Dr. Lorraine E. Henricks, a psychologist, whose report is pending, for a full psychological assessment. Based on my interactions with Mrs. Amira, I am of the opinion that if she in any way offended the court with her actions, she may have done so only out of love and desperation on behalf of her children's - particularly her 5-year old son, Benzion's - predicament.

Mrs. Amira initially presented with symptoms of emotional numbness and poor focus, that she reported experiencing due to her verbally and emotionally abusive marriage to her husband, Eliyahu Amira. Mrs. Amira reported, for example, that her husband controlled such aspects of Mrs. Amira's life, as her daily activities, spending, and appearance. Mrs. Amira also reported what she believed were ongoing signs of abuse she noticed in her husband's behavior with Benzion which, as a mandated reporter, I relayed to the ACS.

In the events leading to, and since, the court's decision to remove Mrs. Amira from her home and her children, Mrs. Amira attended her therapy sessions regularly, with the exception of a 4-week absence, between 7/13/18 and 8/8/18, when Mrs. Amira reported experiencing the most distress, given the 7/20/18 court order to vacate her home and have only agency-supervised visitation with her children. Over the course of her sessions, Mrs. Amira was informed of coping mechanisms, distress tolerance techniques, and focusing strategies she could use to help her deal with her reported marital experiences, as well as

1

her reported unsuccessful attempts to alert ACS and SVU to the abuse she suspected Benzion was experiencing. Mrs. Amira was also informed of vocational and social options to help her re-connect with her daily life to the extent possible, as Mrs. Amira reported isolating herself due to her grief and hopelessness in having her children removed.

To reiterate, based on my interactions with Mrs. Amira, I am of the opinion that if she in any way offended the court with her actions, Mrs. Amira may have done so only out of love and desperation on behalf of her children's - particularly Benzion's - predicament.

 If you need further assistance, please don't hesitate to contact me.


Sincerely,

Rivkah Kaufman


Rivkah Kaufman, LMHC

2

# EXHIBIT F

| **Maimonides** Medical Center | MRN: 90541572  71 | Visit: 502325346 |
|---|---|---|
| | **AMIRA, LANIT** | Age: 29y |
| | DOB: 6/23/1989 | Gender: Female |
| Brooklyn, NY 11219 | Attending: DELEONARDO, ROSS STANLEY | NE4-N410-02 |
| | Admit Date: 12/10/2018 17:32 | Discharge Date: 12/13/2018 11:55 |

| N - Normal | A - Abnormal | AA - Critically Abnormal | H - High | HH - Critically High | L - Low | LL - Critically Low |
|---|---|---|---|---|---|---|

Reference range: Negative
(NOTE)
A negative treponemal  antibody screen indicates no serologic
evidence of syphilis (early infection cannot be excluded) and no
additional testing is required.   A positive screen is followed by
testing for RPR.   Positive RPR indicates serologic evidence of new,
inadequately treated, or persistent syphilis infection and titer
will be performed.  A negative RPR following a positive treponemal
screen may indicate adequately treated or resolved past syphilis
infection.  A negative RPR will trigger a specific treponemal
antibody test, TPPA (treponema pallidum passive particle
agglutination).   A positive TPPA confirms previous or current
syphilis infection.   A negative TPPA suggests that the original
treponemal antibody screen was a false positive, but clinical
assessment of the patient is recommended.

Northwell Health Laboratories
10 NEVADA DRIVE
LAKE SUCCESS NY 11042
Dwayne A. Breining MD

Page: 1 of 1

**Maimonides**
Medical Center

Brooklyn, NY 11219

| | |
|---|---|
| MRN: 90541572  72 | Visit: 502325346 |
| **AMIRA, LANIT** | Age: 29y |
| DOB:      6/23/1989 | Gender: Female |
| Attending: DELEONARDO, ROSS STANLEY | NE4-N410-02 |
| Admit Date: 12/10/2018 17:32 | Discharge Date: 12/13/2018 11:55 |

| N - Normal | A - Abnormal | AA - Critically Abnormal | H - High | HH - Critically High | L - Low | LL - Critically Low |
|---|---|---|---|---|---|---|

| Wednesday, December 12, 2018  8:55 AM | HIV-1/2 EIA, SCR W/RFL | 1 or more Final Results Received |
|---|---|---|

HIV 1/2 EIA                                    [NR]

NONREACTIVE The HIV Ag/Ab Combo test performed screens for HIV p24 antigen and antibodies to
HIV-1 (including group O) and antibodies to HIV-2. All specimens repeatedly reactive will have a confirmatory Multispot HIV-1/HIV-2 rapid Enzyme Immunoassay  performed by the Reference Laboratory. NY State prohibits disclosure of this result to any unauthorized party.
Upon Negative screening for Multispot HIV testing reference laboratory will perform HIV-1 RNA Qualitative reflex testing.

Insert Chart Confidentiality Message

Laboratory Data with HIV  -  Page 1/1                                    Job 444746 (03/12/2019 16:44) -  Page 1  Doc# 1

# EXHIBIT G



06/03/2019

     Lanit Amira came down for an intake at Pesach Tkvah to pursue therapy. Upon intake Lanit agreed to be seen for weekly sessions. As per our meeting today, Lanit presented very well as we spoke about her current predicament. Having spoken at length with Lanit, I didn't see anything that would imply that she is an unfit mother. She seemed both motivated and willing to do right by her children. As director, I feel confident in her parenting abilities.

Yerachmiel Stern, LCSW, Clinic Director

# EXHIBIT H



## Maimonides
### Medical Center
4802 Tenth Avenue • Brooklyn, NY • 11219

38266

**ADDRESS SERVICE REQUESTED**

005463
0101

**DATE DUE:** UPON RECEIPT
**BILL REFERENCE NUMBER:** 18120960971

☐ Please check box if below address is incorrect or insurance information has changed, and indicate change(s) on reverse side.

AMIRA, LANIT
830 46TH ST
BROOKLYN, NY 11220-1613

MAKE CHECKS PAYABLE TO:

IF PAYING BY MASTERCARD, DISCOVER, VISA OR AMERICAN EXPRESS, FILL OUT BELOW.

☐ CHECK
☐ MASTERCARD    ☐ DISCOVER    ☐ VISA    ☐ AMERICAN EXPRESS

| CARD NUMBER | SIGNATURE CODE |
| --- | --- |
| SIGNATURE | EXP. DATE |

| PATIENT NAME | ACCOUNT BALANCE |
| --- | --- |
| AMIRA, LANIT | $ 4199.23 * |

| ACCOUNT NUMBER | AMOUNT DUE NOW | AMOUNT PAYING |
| --- | --- | --- |
| 541572 03 | $1500.00 | |

Recent payments may not be reflected on the statement.

653407D(PC1)

MAIMONIDES MEDICAL CENTER
P.O. BOX 417629
BOSTON, MA 02241-7629

38266*TED0VE3BY000110

Page 1 of 1

---

Thank you for choosing Maimonides Medical Center for your medical needs. We are devoted to high quality patient care, and well being.

### Account Summary

| | |
| --- | --- |
| Statement Date | 01/24/2019 |
| Account Number | 541572 03 |
| Previous Balance | $0.00 |
| Charges | $10665.00 |
| New York State Surcharge | $0.00 |
| Patient Payments | $0.00 |
| Financial Aid Credit | $0.00 |
| Ins. Payments/Contractual Adj. | $-6465.77 |
| *Account Balance | $4199.23 |
| Amount Due Now from Patient | $1500.00 |

### This is the current insurance information on file

*Please review and make corrections on the back of this form*

**Primary Insurance**
FIDELIS CARE SILVER PSYCH

**Secondary Insurance**

Should you wish to provide us with additional billing information you may email us at mmc_insurance@maimonidesmed.org

### Payment Information

Pay your bill online at www.maimonidesmed.org

Pay your bill 24/7 at 1-855-437-2869

### Important Messages

**Payment is due upon receipt.**

PLEASE DETACH AND RETURN TOP PORTION WITH YOUR PAYMENT

### Summary of Patient Services Provided

**SERVICE DATE(S)**  12/10/2018 - 12/13/2018
**Inpatient Services**

| | |
| --- | --- |
| SEMI PRIVATE ROOM | 4680.00 |
| LAB | 767.00 |
| CARDIOLOGY | 232.00 |
| PHARMACY | 224.00 |
| RADIOLOGY | 1807.00 |
| ER | 2330.00 |
| PSYCHIATRY | 625.00 |

### Additional Information

*If your account balance is different from **Amount Due Now**, there may be payments pending from your insurance. You are currently responsible for the amount shown in the **Amount Due Now** box.

**Payment Plans Available**
Should you wish to make arrangements to pay out your outstanding balance, please call our Customer Service Representatives at 718-283-6740, Monday through Friday, 8:00am to 5:00pm.





## Maimonides
### Medical Center
4802 Tenth Avenue • Brooklyn, NY • 11219

38266*TED0VE3BY000110



# EXHIBIT I

Please note that the providers
listed by Fidelis are not even mentioned
in the discharge papers (exhibit A)

Hospital records don't match insurance
billing records.

 Gmail

Lanit Amira <lanitamira@gmail.com>

---

**Fidelis Care [secure]**
1 message

---

**SM Member Mail Request** <MemberMailRequest@fideliscare.org>
To: "lanitamira@gmail.com" <lanitamira@gmail.com>

Tue, Aug 4, 2020 at 9:32 AM

---

Good Morning,


Here is the information you requested.


Thank You!


Member Services Support Associate|Fidelis Care

Quality health coverage. It's Our Mission

 Office: (718) 896-6500


CONFIDENTIALITY NOTICE: This communication contains information intended for the use of the individuals to whom it is addressed and may contain information that is privileged, confidential or exempt from other disclosure under applicable law. If you are not the intended recipient, you are notified that any disclosure, printing, copying, distribution or use of the contents is prohibited. If you have received this in error, please notify the sender immediately by telephone or by returning it by return mail and then permanently delete the communication from your system. Thank you.

---

📄 **LA.pdf**
135K



Fidelis Care
Member Services
95-25 Queens Blvd
Rego Park NY 11374

**Fidelis Care Explanation of Benefits (EOB)**

| | |
|---|---|
| **Statement Date** | 07/31/2020 |
| **Policyholder Name** | Eliyahu Amira |
| **Member Name** | Lanit Amira |
| **Member ID** | 744141795-01 |
| **Plan Name** | Fidelis Care Silver 250 |

Lanit Amira
2920 Avenue N Apt.4F
Brooklyn NY 11210

# THIS IS NOT A BILL

If you owe anything,
your provider will bill you directly.

## Summary of Claims Activity

### Billed Amount $12,837.00

This is the total amount billed by your provider(s) for services included in this statement.

### Allowed Amount $3,802.08

Fidelis Care negotiates with providers to save you money.

This is the amount Fidelis Care allowed for the services billed.

### Your Plan Paid $2,152.08

This is the amount your Fidelis Care plan covered.

### You Owe $1,650.00

This is the sum of the Deductible, Copay, Coinsurance and Not Covered columns.

You will be billed directly by your provider(s) for any outstanding amounts that you owe.

**This amount may not represent your outstanding balance, if any.**

## Deductible and Out-of-Pocket Summary as of 07/31/2020

| Benefits Period | Individual Deductible | | Family Deductible | | Individual Out-of-Pocket | | Family Out-of-Pocket | |
|---|---|---|---|---|---|---|---|---|
| | Applied | Maximum | Applied | Maximum | Applied | Maximum | Applied | Maximum |
| 01/01/2018 - 12/31/2018 | $1,650.00 | $1,650.00 | $1,866.66 | $3,300.00 | $4,857.42 | $5,550.00 | $5,084.08 | $11,100.00 |

### PLEASE SEE CLAIM DETAILS STARTING ON PAGE THREE

If you have any questions about this document, please call Member Services at 1-888-FIDELIS (1-888-343-3547).

TTY: 711

NYHX0001

## About this Document

- This report of claims we have processed explains what care you have received, what the plan has paid, and does not include any payments you have already made.
- If your plan has a deductible, you pay the allowed amount for your care until that deductible has been met – After this you'll only be responsible for copayments and/or coinsurance.
- Your out-of-pocket maximum provides you with financial protection, and tells you the most you will pay in "out-of-pocket" costs (deductible, copayments, and coinsurance).  Once this yearly limit has been met, Fidelis Care will pay the full cost of covered services for the rest of the year.
- If you have questions, or think there might be a mistake, start by calling the doctor's office or other service provider. Ask them to explain the claim. If you still have questions, call Member Services.

## Appeal Rights

If you disagree with the decision on a claim, you or your authorized representative may initiate a standard or expedited appeal by writing to us at:

> Fidelis Care
> 95-25 Queens Boulevard
> Rego Park, NY 11374
>
> OR
>
> Call Member Services:        1-888-FIDELIS  (1-888-343-3547)

You must submit your appeal within 180 calendar days after the statement date of this explanation of benefits. If you fail to submit your appeal within the timeframe, your appeal will be denied and the initial determination will be upheld.  Please include your member ID number, the claim number, and any other additional medical information or documentation supporting your appeal.

For a standard appeal, a decision will be made within 30 calendar days after receipt of your appeal.

If services were denied based on medical necessity, or a determination that they are experimental or investigative, you may have the right to have your appeal reviewed through the New York State External Appeal process.  You can request an external appeal using the form we send you when our final adverse determination is made.

If you have any questions about this document, please call Member Services at 1-888-FIDELIS (1-888-343-3547).

TTY: 711                                                                                                    NYHX0001

# Claims Detail for Lanit Amira (744141795-01)

| Details for Claim ID # 018213773003 | | | | | Provided by Maimonides Medical Center (ID # 040401001742) | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Date of Service | Service Description | Billed Amount | Allowed Amount | Your Plan Paid | Member Responsibility | | | | You Owe | Code |
| | | | | | Deductible | Copay | Coinsurance | Not Covered | | |
| 12/10/2018 - 12/13/2018 | Room and Board Psychiatric | $4,680.00 | $2,602.50 | $1,102.50 | $0.00 | $1,500.00 | $0.00 | $0.00 | $1,500.00 | |
| 12/10/2018 - 12/13/2018 | Pharmacy Inpatient | $200.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | |
| 12/10/2018 - 12/13/2018 | Lab Inpatient | $454.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | |
| 12/10/2018 - 12/13/2018 | Lab Inpatient | $218.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | |
| 12/10/2018 - 12/13/2018 | Lab Inpatient | $60.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | |
| 12/10/2018 - 12/13/2018 | Lab Inpatient | $35.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | |
| 12/10/2018 - 12/13/2018 | Emergency Room Inpatient | $2,330.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | |
| 12/10/2018 - 12/13/2018 | MRI Inpatient | $1,807.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | |
| 12/10/2018 - 12/13/2018 | Pharmacy/Self Administered Rev Code 637 Inpatient | $24.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | |
| 12/10/2018 - 12/13/2018 | Diagnostic EKG/ECG Inpatient | $232.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | |
| 12/10/2018 - 12/13/2018 | Psychiatric Inpatient | $625.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | |
| | **Claim Totals** | $10,665.00 | $2,602.50 | $1,102.50 | $0.00 | $1,500.00 | $0.00 | $0.00 | $1,500.00 | |

| Details for Claim ID # 018234377300 | | | | | Provided by Gerald Hollander (ID # 151001000031) | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Date of Service | Service Description | Billed Amount | Allowed Amount | Your Plan Paid | Member Responsibility | | | | You Owe | Code |
| | | | | | Deductible | Copay | Coinsurance | Not Covered | | |
| 12/10/2018 | EKG no modifier 26 reduction Inpatient | $40.00 | $7.88 | $7.88 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | |
| | **Claim Totals** | $40.00 | $7.88 | $7.88 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | |

If you have any questions about this document, please call Member Services at 1-888-FIDELIS (1-888-343-3547).

TTY: 711

NYHX0001

| Details for Claim ID # 018382070500 | | | | Provided by Matt S. Friedman (ID # 131101000163) | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Date of Service | Service Description | Billed Amount | Allowed Amount | Your Plan Paid | Member Responsibility | | | | You Owe | Code |
| | | | | | Deductible | Copay | Coinsurance | Not Covered | | |
| 12/10/2018 | Emergency Room Visit | $850.00 | $191.19 | $191.19 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | |
| | **Claim Totals** | $850.00 | $191.19 | $191.19 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | |

| Details for Claim ID # 018384115000 | | | | Provided by Jessica J. Richter (ID # 151123000036) | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Date of Service | Service Description | Billed Amount | Allowed Amount | Your Plan Paid | Member Responsibility | | | | You Owe | Code |
| | | | | | Deductible | Copay | Coinsurance | Not Covered | | |
| 12/10/2018 | Emergency Room Visit POS 22,24,52-53 | $195.00 | $151.87 | $151.87 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | |
| | **Claim Totals** | $195.00 | $151.87 | $151.87 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | |

| Details for Claim ID # 018572408600 | | | | Provided by Evan G. Stein (ID # 110915000137) | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Date of Service | Service Description | Billed Amount | Allowed Amount | Your Plan Paid | Member Responsibility | | | | You Owe | Code |
| | | | | | Deductible | Copay | Coinsurance | Not Covered | | |
| 12/12/2018 | MRI Inpatient Professional Component | $275.00 | $63.59 | $63.59 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | |
| | **Claim Totals** | $275.00 | $63.59 | $63.59 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | |

| Details for Claim ID # 018573394100 | | | | Provided by Maimonides Paramedic Ambulance (ID # 040401001512) | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Date of Service | Service Description | Billed Amount | Allowed Amount | Your Plan Paid | Member Responsibility | | | | You Owe | Code |
| | | | | | Deductible | Copay | Coinsurance | Not Covered | | |
| 12/10/2018 | HCPCS Ambulance Outpatient | $800.00 | $775.05 | $625.05 | $0.00 | $150.00 | $0.00 | $0.00 | $150.00 | |
| 12/10/2018 | HCPCS Ambulance Outpatient | $12.00 | $10.00 | $10.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | |
| | **Claim Totals** | $812.00 | $785.05 | $635.05 | $0.00 | $150.00 | $0.00 | $0.00 | $150.00 | |

**Processed in accordance with your benefits. You may be responsible for the patient share 'You Owe' column.**

If you have any questions about this document, please call Member Services at 1-888-FIDELIS (1-888-343-3547).

TTY: 711

NYHX0001