UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------X

LANIT AMIRA,

                Plaintiff,

      -against-

MAIMONIDES HOSPITAL;
MAIMONIDES PARAMEDIC SERVICES;
HATZALAH PARAMEDIC SERVICES;
JOHN DOE; and JANE DOE,

                Defendants.

------------------------------------------------------------X

**REPORT AND
RECOMMENDATION**
21-CV-3976 (RPK) (TAM)

**TARYN A. MERKL**, United States Magistrate Judge:

Plaintiff Lanit Amira initiated this action against Defendants Maimonides

Medical Center[1] ("Maimonides") and Hatzalah Paramedic Services ("Hatzalah") on July

6, 2021, alleging claims under 42 U.S.C. § 1983 and 42 U.S.C. § 1395dd, the Emergency

Medical Treatment and Active Labor Act (EMTALA). (*See* Complaint ("Compl."), ECF

No. 1; Second Amended Complaint ("SAC"), ECF No. 32.) Plaintiff alleges that

---

[1] Plaintiff originally named both "Maimonides Hospital" and "Maimonides Paramedic Services" in this action. (*See* Second Amended Complaint ("SAC"), ECF No. 32.) Defendant "Maimonides Medical Center s/h/a Maimonides Hospital" filed an Answer, and Plaintiff has not objected to its participation in this action. (*See* Answer, ECF No. 10.) Accordingly, the Court refers to Maimonides Medical Center (or "Maimonides") throughout this Report and Recommendation. As for "Maimonides Paramedic Services," the Court notes that Maimonides has asserted that this defendant "does not exist as an entity" and is simply "part of Maimonides Medical Center's Emergency Response Unit" (despite having filed an Answer on behalf of "Maimonides Paramedic Services"). (Mem. in Supp. of Maimonides's First Mot. to Dismiss, ECF No. 23-1, at 4; *see* Maimonides Paramedic Services' Answer, ECF No. 11.) The Court further notes, however, that Plaintiff has amended her complaint to name "the individual members of Maimonides Paramedic Services" involved in the underlying events, as John and Jane Doe defendants. One way to read Plaintiff's allegations against "Maimonides Paramedic Services" is as claims against the Doe defendants, not the entity itself. Regardless, for reasons explained in this Report and Recommendation, the distinction is irrelevant, i.e., Plaintiff fails to allege that *any* of the defendants — the entities or the Doe defendants — were state actors for the purposes of her § 1983 claims. For simplicity's sake, the Court therefore refers to both "Maimonides Paramedic Services" and the Doe defendants as Maimonides's paramedics.

Defendants' paramedics unlawfully seized her from her home and that she was later held against her will at Maimonides's facility in Brooklyn, New York. (*See* SAC, ECF No. 32.) Plaintiff has also named the individual Maimonides paramedics involved in the underlying events as John and Jane Doe Defendants. (*Id.* at 3, ¶ 5.[2])

Currently before the Court are Maimonides's and Hatzalah's respective motions to dismiss for failure to state a claim. (*See* Hatzalah's Third Mot. to Dismiss ("Hatzalah MTD"), ECF No. 35; Maimonides's Second Mot. to Dismiss ("Maimonides MTD"), ECF No. 36.) For the reasons set forth below, the Court respectfully recommends that both motions be granted.

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

## I.  Factual Background

This case arises from Plaintiff's involuntary admission to Maimonides in December 2018. (Compl., ECF No. 1, at 2.) As noted above, Plaintiff initiated this action on July 6, 2021. (*See id.*) Defendants include Maimonides and its paramedic staff, as well as Hatzalah, a volunteer ambulance company that initially responded to Plaintiff's home. (*See generally id.*; *see also* SAC, ECF No. 32.) Plaintiff alleges as follows.

On December 10, 2018, Plaintiff was at home with her mother in Brooklyn, New York. (SAC, ECF No. 32, at 4–5, ¶¶ 16, 21.) Concerned about Plaintiff's "behavior over the last few months," Plaintiff's mother called Hatzalah on the recommendation of a friend. (*Id.* at 5, ¶ 19.) Plaintiff's mother reported that Plaintiff "had just gotten divorced and was going through a hard time due to [resulting] custody matters." (*Id.*) "She also said that [Plaintiff] was more aggressive than usual" and raised "some other

---

[2] The allegations in the Second Amended Complaint restart at paragraph one several times throughout the pleading. For clarity, the Court uses both page and paragraph numbers when citing the Second Amended Complaint.

complaints" about Plaintiff's behavior. (*Id.*) In response, Hatzalah dispatched an ambulance and several paramedics to Plaintiff's home. (*Id.* at 5, ¶ 20.)

The paramedics arrived and informed Plaintiff that she "was obligated to go to the hospital for psychiatric treatment." (*Id.* at 5, ¶ 22.) Plaintiff "told them that [she didn't] need a psychiatric assessment" and presented them with a letter from her psychologist. (*Id.* at 5, ¶¶ 22, 24.) The paramedics insisted, explaining that "suicide was a risk," and further prevented Plaintiff from leaving the room. (*Id.* at 5, ¶ 25 ("One stood in front of me and the other in back of me.").) As Plaintiff alleges, the situation was "scary and felt unsafe." (*Id.* at 6, ¶ 27.) Although her mother encouraged her to go with the paramedics, Plaintiff still declined. (*Id.* at 6, ¶¶ 31–32.)

After about two hours, Hatzalah's paramedics "call[ed] for back-up." (*Id.* at 6, ¶ 32.) Four to six of Maimonides's paramedics then arrived, along "with a police officer." (*Id.* at 6, ¶ 33.) Upon their arrival, "Hatzalah['s] paramedics waited outside." (*Id.* at 6–7, ¶ 34.)

Plaintiff recounts as follows:

> The Maimonides paramedics surrounded me while I sat on the couch. They told me that I simply didn't have a choice and I had to allow them to take me to the hospital. The police officer chimed in[,] in agreement. His presence clearly changed the game. I felt like I didn't have a choice. They all kept pressuring me and told me that it would be best for me to comply without issues.

(*Id.*) Eventually, "the Maimonides paramedics placed [her] in their ambulance and drove to" Maimonides's facility. (*Id.* at 7, ¶ 37.) "Hatzalah['s] ambulance followed along," and "both Hatzalah and Maimonides paramedics escorted [Plaintiff] into the emergency room." (*Id.*)

Plaintiff arrived at the emergency room around 5:00 p.m., at which point a nurse instructed her to change into a hospital robe and to place her belongings in a plastic

bag. (*Id.* at 7, ¶¶ 39–40.) Plaintiff initially refused, "demand[ing] to be seen by a doctor first." (*Id.* at 7, ¶ 40.) The nurse informed Plaintiff that, if she continued to refuse, the nurse would "have to call the police and . . . force [her] into compliance." (*Id.*) The nurse further stated that, once Plaintiff complied, the doctor would see her "immediately after that." (*Id.*)

Plaintiff did as she was told and waited for the doctor. (*Id.* at 8, ¶ 42.) Meanwhile, a doctor spoke with Plaintiff's parents, who had by that point arrived at the emergency room. (*Id.*) The doctor then admitted Plaintiff into the hospital "without first speaking to" Plaintiff herself. (*Id.* at 8, ¶¶ 42–43.) Plaintiff was moved to an observation room and spent the night at Maimonides's facility. (*Id.* at 8, ¶¶ 44–45.) Plaintiff remained in Maimonides's care for three days, during which time members of Maimonides's staff took blood samples, took drug tests, and administered medication. (*See id.* at 7–13, ¶¶ 39–80.) Plaintiff was ultimately discharged on December 13, 2018. (*See id.* at 13, ¶ 77.)

## II.  Procedural History

Plaintiff filed suit on July 6, 2021, and has twice amended the Complaint. (*See* Compl., ECF No. 1; First Amend. Compl., ECF No. 18; SAC, ECF No. 32.) Her most recent pleading alleges twenty-one separate causes of action against Defendants. (*See generally* SAC, ECF No. 32, at 26–41, ¶¶ 30–195.)

Only some of Plaintiff's claims arise under federal law. These include § 1983 claims against Maimonides and its paramedics based on violations of her Fourth and Fourteenth Amendment rights (claims three and four against "Maimonides Paramedic Services" and the Doe defendants; claims two and three against Maimonides). (*See id.* at 31, 33–34, ¶¶ 78–85, 107–14.) More specifically, Plaintiff alleges that Maimonides's paramedics unlawfully seized her person by taking her from her home and transporting her to Maimonides's facility against her will. (*See id.* at 31, ¶¶ 78–85.) Plaintiff also

alleges that Maimonides unlawfully seized her personal belongings when she arrived at the emergency room. (*Id.* at 33, ¶ 111.) Plaintiff further asserts that Maimonides violated her due process rights by failing to evaluate her prior to her involuntary transport, failing to fill out state-mandated forms at such time, and later failing to evaluate Plaintiff before her committal at Maimonides's facility. (*Id.* at 31, 33, ¶¶ 81–82, 112.)

Plaintiff raises similar § 1983 claims against Hatzalah (claims three and four against Hatzalah). Plaintiff alleges that, although she "was ultimately taken to Maimonides hospital by the Maimonides paramedics," Hatzalah was still "involved in the seizure [of her person], in every aspect." (*Id.* at 29, ¶ 62.) In Plaintiff's words, "Hatzalah [p]aramedics still waited in my home until I was seized. They drove alongside Maimonides Paramedic Services to Maimonides Hospital and led me to the emergency room." (*Id.*) Plaintiff further alleges that, like Maimonides's paramedics, Hatzalah's paramedics violated her due process rights by failing to evaluate her while at her home and failing to fill out state-mandated forms. (*Id.* at 29, ¶ 60.)

Plaintiff's remaining federal claim is against Maimonides, alleging a violation of EMTALA (claim five against Maimonides).[3] (*See id.* at 35, ¶¶ 124–31.) Echoing some of her other allegations, the basis of Plaintiff's EMTALA claim is that Maimonides's staff "failed to evaluate [Plaintiff] in the emergency room, prior to placing [her] under observation." (*Id.* at 35, ¶ 126.)

---

[3] In her initial pleading, Plaintiff also alleged violations of the Health Insurance Portability and Accounting Act ("HIPAA") by Maimonides, premised on Maimonides's employees' communications with Plaintiff's parents regarding her care. *See* 42 U.S.C. §§ 1320d-1 to 1320d-7. (Compl., ECF No. 1, ¶¶ 122–24.) Plaintiff has since restyled this claim as a violation of doctor-patient confidentiality, sounding in ordinary negligence or medical malpractice. (*See* SAC, ECF No. 32, at 35–36.) The Court notes that the Second Circuit has explicitly held that HIPAA does not provide a private cause of action. *See Meadows v. United Servs., Inc.*, 963 F.3d 240, 244 (2d Cir. 2020) ("Instead, HIPAA provides for penalties to be imposed by the Secretary of the Department of Health and Human Services."). The Court therefore addresses Plaintiff's claim as alleged in the Second Amended Complaint.

The rest of Plaintiff's claims arise under state law. Against Hatzalah, Plaintiff has brought claims for gross negligence and intentional infliction of emotional distress ("IIED"). (*Id.* at 27–28, ¶¶ 30–55.) Against Maimonides's paramedics, Plaintiff has likewise brought claims for gross negligence and IIED. (*Id.* at 29–30, ¶¶ 65–77.) Generally speaking, each of these claims arise from actions Hatzalah, its paramedics, or Maimonides's paramedics took from the time Plaintiff's mother called Hatzalah, through Plaintiff's involuntary transport by Defendants to Maimonides's facility. (*See id.* at 27–30, ¶¶ 30–55, 65–77.)

The bulk of Plaintiff's state law claims, however, are against Maimonides itself and relate to her treatment upon arrival at the emergency room. Plaintiff alleges claims for "reckless negligence," IIED, breach of doctor-patient confidentiality, defamation, and false imprisonment. (*See id.* at 31–36, 40–41, ¶¶ 86–106, 115–23, 132–38, 183–95.) Plaintiff also points to more specific acts and omissions taken by Maimonides's staff, each set forth as a standalone cause of action as follows: "Reckless Administration of Medication," "Failure to Obtain Consent for Lab Testing," "Failure to Provide a Psychiatrist to Evaluate Me During Entire Hospitalization," "Fail[ure] to Provide [M]e [w]ith My Daily Prescription," and "Fail[ure] to Use Least Restrictive Method."[4] (*See id.* at 36–40, ¶¶ 139–82.)

Summons were issued as to Hatzalah and Maimonides on October 20, 2021, and Plaintiff later filed a notice indicating that service was accomplished by November 1, 2021. (*See* Summons Issued, ECF No. 5; Nov. 22, 2021 Notice, ECF No. 14.) Maimonides

---

[4] Except for this last cause of action, the allegations in this group of claims are largely self-explanatory. Plaintiff's claim for "Fail[ure] to Use Least Restrictive Method" appears to be that, because Maimonides "knew [she] wasn't mentally ill" or dangerous, it should have instead required her to attend therapy, rather than "continue the hospitalization day after day." (SAC, ECF No. 32, at 40, ¶¶ 176–77.)

filed an answer on November 15, 2021, affirmatively asserting that Plaintiff had "failed to state a cause of action upon which relief [could] be granted." (*See* Maimonides's Answer, ECF No. 10, ¶ 76.) Hatzalah did not file a responsive pleading, but submitted a pre-motion conference letter on November 15, 2021, "for an intended motion pursuant to Fed. R. Civ. P. 12(b) to dismiss." (Hatzalah's Mot. for Pre-Mot. Conference, ECF No. 13, at 1.) By order, the Honorable Rachel P. Kovner directed that "a pre-motion conference [was] not necessary in this case because plaintiff [was] proceeding *pro se*." (Nov. 16, 2021 ECF Order.) Judge Kovner stated that she would instead "discuss the anticipated motion to dismiss with the parties" and "set a briefing schedule" at an initial conference that had already been scheduled for December 10, 2021. (*Id.*) Maimonides subsequently filed a letter indicating that it likewise intended to move for dismissal of all claims. (*See* Maimonides's Dec. 8, 2021 Letter, ECF No. 16.)

The initial conference was held telephonically on December 10, 2021, at which the parties discussed the anticipated motions to dismiss. (*See* Dec. 10, 2021 Minute Entry & Order.) Judge Kovner set a briefing schedule and granted Plaintiff leave to amend her complaint by December 27, 2021. (*Id.*) Since the initial conference, Defendants have each filed motions to dismiss in response to Plaintiff's amended pleadings. Only the last round of motions is currently before the Court.

Hatzalah first filed a motion to dismiss on January 10, 2022. (*See* Hatzalah's First Motion to Dismiss, ECF No. 17.) By that point, however, Plaintiff had already amended her pleading. Although several days late, Plaintiff filed the First Amended Complaint on January 6, 2022. (*See* First Amend. Compl., ECF No. 18.) Plaintiff filed a letter that same day, indicating that she had "accidentally confused the dates" set at the initial conference and apologizing for the delay. (Pl.'s Jan. 6, 2022 Letter, ECF No. 19.) On January 11, 2022, the day after Hatzalah filed its motion to dismiss, Hatzalah submitted

a letter stating that it had just received a copy of the First Amended Complaint and requesting that "the Court treat plaintiff's untimely amended complaint as a nullity and allow the 12(b) motion to proceed as scheduled." (Hatzalah's Jan. 11, 2022 Letter, ECF No. 20, at 2.) Maimonides submitted a letter to the same effect. (*See* Maimonides's Jan. 11, 2022 Letter, ECF No. 21.) On January 12, 2022, Judge Kovner noted Plaintiff's confusion about the due dates and granted her "an extension *nunc pro tunc* for filing the amended complaint to" January 6, 2022, i.e., the date Plaintiff had filed the First Amended Complaint. (Jan. 12, 2022 ECF Order.) In light of Plaintiff's amended pleading, Judge Kovner declared Hatzalah's motion to dismiss moot and set a new briefing schedule. (*Id.*)

Maimonides subsequently filed a motion to dismiss on February 17, 2022, and Hatzalah responded with its second motion to dismiss the following day. (*See* Maimonides's First Mot. to Dismiss, ECF No. 23; Hatzalah's Second Mot. to Dismiss, ECF No. 26.) Plaintiff submitted a memorandum in opposition to Defendants' motions, and Hatzalah and Maimonides later filed their respective replies. (*See* Pl.'s Opp'n to Defs.' Mots. to Dismiss, ECF No. 27; Reply in Supp. of Hatzalah's Second Mot. to Dismiss, ECF No. 29; Reply in Supp. of Maimonides's Mot. to Dismiss, ECF No. 30.)

Upon receipt of the parties' filings, Judge Kovner issued an order indicating that Plaintiff's § 1983 claims were at risk of *sua sponte* dismissal. (*See* Apr. 21, 2022 ECF Order.) In her order, Judge Kovner observed that "'private employers are not liable under [Section] 1983 for the constitutional torts of their employees, unless the plaintiff proves that action pursuant to official policy of some nature caused a constitutional tort.'" (*See id.* (quoting *Rojas v. Alexander's Dep't Store*, 924 F.2d 406, 408–09 (2d Cir. 1990)).) Judge Kovner further noted that Plaintiff's allegations were "about the actions of individual employees of Maimonides," but that these employees were "not named as

defendants" in Plaintiff's complaint. (*Id.*) Plaintiff was therefore directed to "respond[] to that potential ground for dismissal" or, alternatively, to "file a second amended complaint by" May 16, 2022, "correcting [these] deficiencies." (*Id.*)

Plaintiff attempted to do both. On May 16, 2022, Plaintiff submitted a memorandum of law addressing whether Defendants' allegedly unconstitutional acts resulted from an official policy. (*See generally* Pl.'s Mem. of Law, ECF No. 31.) Along with her memorandum of law, Plaintiff filed the Second Amended Complaint, this time identifying "the individual members of Maimonides Paramedic Services" as John and Jane Doe defendants. (*See* SAC, ECF No. 32, at 3, ¶ 5.)

Defendants again challenged Plaintiff's submissions. Hatzalah observed that, in addition to naming Doe defendants in the Second Amended Complaint, Plaintiff had made other substantive changes to her allegations that, in Hatzalah's view, had not been permitted under the prior order. (*See* May 17, 2022 Letter, ECF No. 33, at 2.) In response, Judge Kovner granted Plaintiff leave *nunc pro tunc* to make the disputed amendments. (May 18, 2022 ECF Order.) Further, because the Second Amended Complaint was then the operative pleading, Judge Kovner terminated Defendants' pending motions to dismiss as moot. (*Id.*) For its part, Maimonides later submitted a letter arguing that Plaintiff's "new filings [did] not comply with the Court's" prior order, in part, because Plaintiff had been directed to *either* submit a response to the order or amend her complaint. (*See* May 25, 2022 Letter, ECF No. 34.) Judge Kovner "decline[d] to strike plaintiff's memorandum" of law and further advised the parties that "the Court [would] likely consider statements in plaintiff's legal memorandum . . . 'to supplement or clarify the plaintiff's pleaded allegations' on defendants' anticipated motion to dismiss." (May 26, 2022 ECF Order (quoting *Somersett v. City of New York*, No. 09-CV-5916 (LTS) (KNF), 2011 WL 2565301, at *3 (S.D.N.Y. June 28, 2011)).)

A few weeks later, Hatzalah and Maimonides submitted the motions to dismiss that are currently pending. (*See* Hatzalah MTD, ECF No. 35; Maimonides MTD, ECF No. 36.) As discussed below, Hatzalah asserts that Plaintiff's § 1983 claims necessarily fail because Hatzalah is not a state actor. (*See* Mem. in Supp. of Hatzalah MTD ("Hatzalah Mem."), ECF No. 35-1, at 5–10.) Maimonides makes the same argument as to Plaintiff's remaining § 1983 claims, i.e., because no state actors were involved, Plaintiff cannot sue Maimonides or its paramedics for constitutional violations. (*See* Maimonides MTD, ECF No. 36, at 8–12, 13–20.) Maimonides further argues that Plaintiff's EMTALA claim is time-barred. (*Id.* at 22.) As for Plaintiff's state law claims, Defendants argue that dismissal is appropriate, *inter alia*, because Plaintiff filed them after the applicable statute of limitations periods had already run. (*See id.* at 7–8, 12–13, 20–24; Hatzalah Mem., ECF No. 35-1, at 11–14.)

Judge Kovner referred both motions to dismiss to the undersigned Magistrate Judge on September 17, 2022. (*See* Sept. 17, 2022 ECF Order.) For the reasons set forth below, the Court recommends dismissal of Plaintiff's claims.

## DISCUSSION

### I. Legal Standards

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive dismissal, the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In other words, a plaintiff must allege "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A plaintiff must establish "more than a sheer possibility that a defendant has acted

unlawfully." *Id.* ("Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility . . . .'" (quoting *Twombly*, 550 U.S. at 557)).

"The court's function on a Rule 12(b)(6) motion is not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985). Accordingly, "all factual allegations in the complaint are accepted as true and all inferences are drawn in the plaintiff's favor." *Littlejohn v. City of New York*, 795 F.3d 297, 306 (2d Cir. 2015). The court may also consider "documents attached as exhibits or incorporated by reference in the pleadings and matters of which judicial notice may be taken." *Samuels v. Air Transp. Local 504*, 992 F.2d 12, 15 (2d Cir. 1993).

Finally, "[i]t is well established that a court is ordinarily obligated to afford a special solicitude to *pro se* litigants." *Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010). *Pro se* complaints, in particular, "must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). Although a *pro se* complaint is "construed liberally . . . and interpreted to raise the strongest claims that it suggests," it must still state a plausible claim for relief. *Hogan v. Fischer*, 738 F.3d 509, 515 (2d Cir. 2013).

## II.  Analysis

Defendants collectively argue that Plaintiff "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). With respect to Plaintiff's § 1983 claims, Defendants' arguments are the same: they and their employees are private actors and, consequently, cannot be liable for constitutional violations. (Hatzalah Mem., ECF No. 35-1, at 5–10; Maimonides MTD, ECF No. 36, at 8–14.) As to Plaintiff's EMTALA claim, Maimonides argues that it is time-barred. (Maimonides MTD, ECF No. 36, at 21–22.) For

the reasons discussed below, Defendants' motions should be granted and the Court recommends dismissal of Plaintiff's federal claims. In addition, upon dismissal of Plaintiff's federal claims, there will be no independent basis for federal jurisdiction. Accordingly, as to the remaining state law claims, the Court respectfully recommends dismissal without prejudice.

### A. Section 1983 Claims

"Under 42 U.S.C. § 1983, constitutional torts are only actionable against state actors or private parties acting 'under the color of' state law." *Betts v. Shearman*, 751 F.3d 78, 84 (2d Cir. 2014) (quoting *Ciambriello v. County of Nassau*, 292 F.3d 307, 323 (2d Cir. 2002)). "Thus, the § 1983 plaintiff bears the burden of showing state action on the part of the defendant." *Bryant v. Steele*, 462 F. Supp. 3d 249, 266 (E.D.N.Y. 2020).

Defendants argue that Plaintiff fails to meet her burden of showing state action, given that neither they nor their employees are state actors. (Hatzalah Mem., ECF No. 35-1, at 5–10; Maimonides MTD, ECF No. 36, at 8–14.) For her part, Plaintiff concedes that Defendants are private actors not ordinarily subject to suit under § 1983. (Pl.'s Opp'n, ECF No. 38, at 10, 15; SAC, ECF No. 32, at 3–4, ¶¶ 1–15.) Plaintiff correctly observes, however, that even private parties can be liable for constitutional violations under the state action doctrine. (*See* Pl.'s Opp'n, ECF No. 38, at 10–11, 14–15; SAC, ECF No. 32, at 3–4, ¶¶ 1–15.) Plaintiff's arguments therefore focus on whether Defendants qualify as state actors for the purposes of this case.

"[A] private entity can qualify as a state actor in a few limited circumstances." *Manhattan Cmty. Access Corp. v. Halleck* ("*Halleck*"), 139 S. Ct. 1921, 1928 (2019). In *Halleck*, the Supreme Court identified three of these circumstances: "(i) when the private entity performs a traditional, exclusive public function, (ii) when the government compels the private entity to take a particular action, or (iii) when the government acts

jointly with the private entity." *Id.* (citations omitted). "While the Supreme Court did not indicate that those circumstances exhaust the possibilities, their limited number evinces that holding a private actor liable for constitutional violations is a high bar." *Lurch v. City of New York*, No. 19-CV-11253 (AJN), 2021 WL 1226927, at *3 (S.D.N.Y. Mar. 31, 2021).

Plaintiff directs the Court to a purported fourth circumstance identified by the Ninth Circuit: where the "governmental nexus" test applies. (Pl.'s Opp'n, ECF No. 38, at 10 (citing *Kirtley v. Rainey*, 326 F.3d 1088, 1092 (9th Cir. 2003)).) This test traces to *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345 (1974), in which the Supreme Court stated that a private entity qualifies as a state actor when "there is a sufficiently close nexus between the State and the challenged action." *Id.* at 351; *see also Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001) ("[S]tate action may be found if . . . there is such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself.'" (quoting *Jackson*, 419 U.S. at 351)). In this circuit, however, whether there is a close nexus between the State and the challenged action is examined under the joint action test, the third circumstance identified in *Halleck*. *See Sybalksi v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008) (citing *Brentwood*, 531 U.S. at 296). Courts in this circuit therefore focus on *Halleck*'s "three main tests," with the "fundamental question under each test [being] whether the private entity's challenged actions are 'fairly attributable' to the state." *Fabrikant v. French*, 691 F.3d 193, 207 (2d Cir. 2012); *see also Barrows v. Becerra*, 24 F.4th 116, 135 (2d Cir. 2022). An assessment of whether Defendants qualify as state actors under any of these three tests demonstrates that they do not.

1. *Public Function Test*

Under the public function test, "a private entity may qualify as a state actor when it exercises 'powers traditionally exclusively reserved to the State.'" *Halleck*, 139 S. Ct. at 1928 (quoting *Jackson*, 419 U.S. at 352)). Importantly, "[i]t is not enough that the federal, state, or local government exercised the function in the past, or still does. And it is not enough that the function serves the public good or the public interest in some way." *Id.* at 1928–29.

Here, Plaintiff alleges that the § 1983 violations occurred in the context of Defendants' ambulance services and her commitment at Maimonides. (*See generally* SAC, ECF No. 32.) But neither function — ambulance services or involuntary commitment — is traditionally and exclusively the prerogative of the state.

In *Grogan v. Blooming Grove Volunteer Ambulance Corps*, a case addressing § 1983 claims brought against an ambulance services provider, the Second Circuit had occasion to evaluate whether ambulance services are a traditionally exclusive public function. 768 F.3d 259 (2d Cir. 2014). There, one of the provider's employees brought suit after its board of directors allegedly "violated her constitutional rights under the First and Fourteenth Amendments." *See id.* at 262–63. Although the provider was a private entity, the employee argued that "the provision of emergency medical care and general ambulance services" qualified as a traditionally exclusive public function, such that the board's conduct amounted to state action. *Id.* at 265. The Second Circuit disagreed, concluding instead that "ambulance services in this country historically were provided by an array of non-state actors, including hospitals, private ambulance services, and . . . funeral homes" — including in New York. *Id.* Accordingly, the employee could not sustain her § 1983 claims against the provider based on a public function theory of state action. *See id.* The Court sees no basis for concluding that *Grogan* does not control here.

Consequently, Defendants' provision of ambulance services does not render them state actors under the public function test.

The Second Circuit has also soundly held that involuntary commitment is not a traditionally exclusive public function. *See McGugan v. Aldana-Bernier*, 752 F.3d 224, 229–31 (2d Cir. 2014); *Sybalski*, 546 F.3d at 259; *Doe v. Rosenberg*, 166 F.3d 507 (2d Cir. 1999) (per curiam); *see also Amid v. Chase*, 720 F. App'x 6, 10–11 (2d Cir. 2017); *Andersen v. N. Shore Long Island Jewish Health Sys.'s Zucker Hillside Hosp.*, 632 F. App'x 13, 14 (2d Cir. 2016). This is because "involuntary commitment has long been a private remedy" and a function performed by both "private and public institutions" in New York. *Doe v. Rosenberg*, 996 F. Supp. 343, 356 (S.D.N.Y. 1998), *aff'd* 166 F.3d 507 (2d Cir. 1999) (adopting the "district court's comprehensive and scholarly opinion"); *see also Sybalski*, 546 F.3d at 259–60 (same). The fact that Defendants were involved in Plaintiff's involuntary commitment is therefore insufficient to conclude they are state actors under the public function test.[5]

In sum, Plaintiff fails to allege facts sufficient to plausibly infer that Defendants were engaged in a function traditionally and exclusively provided by the state.

---

[5] Plaintiff cites two cases, *Rubenstein v. Benedictine Hospital*, 790 F. Supp. 396 (N.D.N.Y. 1992) and *Ruffler v. Phelps Memorial Hospital*, 453 F. Supp. 1062 (S.D.N.Y. 1978), for the proposition that "[c]ivil commitment and treatment of the mentally ill is undoubtedly a 'public function' in New York." *Ruffler*, 453 F. Supp. at 1068. (*See* SAC, ECF No. 32, at 21, ¶ 10.) Although Plaintiff is correct about the holdings of those two cases, the Second Circuit has subsequently rejected that proposition. *See Doe v. Rosenberg*, 166 F.3d 507 (2d Cir. 1999) (per curiam). In *Doe v. Rosenberg*, the Second Circuit adopted the "district court's comprehensive and scholarly opinion," which rejected the reasoning in *Rubenstein* and *Ruffler* on the basis that those decisions "'only inquired as to the public nature of the function and did not determine if *exclusivity* existed.'" *Doe v. Rosenberg*, 996 F. Supp. 343, 354 (S.D.N.Y. 1998) (emphasis added) (quoting *Harvey v. Harvey*, 949 F.2d 1127, 1131 n.10 (11th Cir. 1992)), *aff'd* 166 F.3d 507 (2d Cir. 1999). *Rosenberg* remains controlling precedent in this circuit. *See McGugan*, 752 F.3d at 229–30 (declining to distinguish or overrule *Rosenberg*); *Sybalski*, 546 F.3d at 259 (quoting *Rosenberg* extensively). Furthermore, the Supreme Court's decision in *Halleck* reaffirms that exclusivity is required under the public function test. *See Halleck*, 139 S. Ct. at 1929 (emphasizing that "the government must have traditionally *and* exclusively performed the function").

2. *Compulsion Test*

Under "the compulsion test," a private entity's actions "are attributable to the state when . . . the entity acts pursuant to the 'coercive power' of the State or is 'controlled' by the state." *Sybalski*, 546 F.3d at 257 (quoting *Brentwood*, 531 U.S. at 296); *see also Blum v. Yaretsky*, 457 U.S. 991, 1004 (explaining that the state must have "exercised coercive power or . . . that the choice must in law be deemed to be that of the State"). More to the point, the "plaintiff must show that the government compelled the *particular* activity that . . . caused the constitutional injury." *Halleck v. Manhattan Cmty. Access Corp.*, 882 F.3d 300, 310 (2d Cir. 2018) (Jacobs, J., concurring in part and dissenting in part) (emphasis added); *see also O'Brien v. Carrier Coach, Inc.*, No. 03-CV-875C(F), 2006 WL 692409, at *3 (W.D.N.Y. Mar. 13, 2006) ("Courts in the Second Circuit have held that in order to satisfy this test, plaintiff must allege 'actual coercion' by a state actor that impacts upon the private actor's decision-making."). "Mere approval of or acquiescence in the initiatives of a private party is not sufficient." *Blum*, 457 U.S. at 1004.

With respect to her claims against Hatzalah, Plaintiff's allegations fall short of pleading sufficient facts to infer state compulsion. As claimed in the pleadings, Hatzalah dispatched its paramedics in response to a phone call by Plaintiff's mother, a private actor. (*See* SAC, ECF No. 32, at 5, ¶ 20.) Then, after Plaintiff refused to go to the hospital, Hatzalah's paramedics called for back-up and waited outside once Maimonides's paramedics and the police officer arrived. (*See id.* at 6, ¶¶ 32–33.) Such allegations fail to establish the type of government control or coercion required under the compulsion test.

Plaintiff's allegations against Maimonides's paramedics fare somewhat better. As alleged, "Maimonides's paramedics walked in with a police officer" who, after the

paramedics insisted that Plaintiff go to the hospital, "chimed in[,] in agreement." (*Id.* at 6–7, ¶¶ 33–34.) Plaintiff further alleges that the officer's "presence clearly changed the game" and made her feel intimidated. (*Id.* at 7, ¶ 34.) These allegations begin to set forth a plausible theory of state compulsion.

However, Plaintiff's pleadings ultimately fall short of establishing such a claim. Although courts must interpret a *pro se* plaintiff's allegations "to raise the strongest arguments that they suggest," the special solicitude does not mandate the inference of facts left wholly unalleged in the complaint. *See Meadows v. United Servs., Inc.*, 963 F.3d 240, 243–44 (2d Cir. 2020) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006)). In other words, while courts broadly construe what a *pro se* plaintiff has alleged, those allegations must still, on their own terms, cross "the line between possibility and plausibility" of a claim to relief. *Twombly*, 550 U.S. at 557; *see Hogan*, 738 F.3d at 515 ("Nonetheless, a *pro se* complaint must state a plausible claim for relief."). This case is thus similar to *Meadows v. United Services, Inc.*, where a *pro se* plaintiff sued under § 1983, alleging — like in this case — that the private defendant's employees had entered his home "accompanied by two [police] officers." 963 F.3d at 242. The Second Circuit held that those allegations, construed liberally, were insufficient to establish state action by the defendant. *See id.* at 243. So is the case here.

Like in *Meadows*, Plaintiff alleges that the officer accompanied Maimonides's paramedics into her home. (*See* SAC, ECF No. 32, at 6, ¶ 33.) Although Plaintiff goes a step further than the plaintiff in *Meadows* by alleging that the officer "chimed in[,] in agreement," (*id.* at 6–7, ¶ 34), "[m]ere approval of or acquiescence in the initiatives of a private party is not sufficient" to establish state compulsion. *Blum*, 457 U.S. at 1004; *see also Turturro v. Cont'l Airlines*, 334 F. Supp. 2d 383, 395 (S.D.N.Y. 2004) ("Plaintiff fails to meet the requirements of the state compulsion test because there is no showing of

persuasion or inducement over the [private defendants] by the [state actors].") Without more, Plaintiff's allegations fail to establish a plausible claim that the paramedics' conduct at her home amounts to that of the state under the compulsion test.

Regarding the events that took place after Plaintiff was taken from her home, there is likewise no support for an inference of state compulsion. Beyond what occurred at her home, Plaintiff does not allege any other involvement by the police officer or other state actors. Plaintiff alleges only that Maimonides's and Hatzalah's paramedics transported her to the emergency room against her will and that, from there, she was placed in Maimonides's custody. (*See* SAC, ECF No. 32, at 7, ¶ 37.) At most, Plaintiff claims that her first treating nurse threatened to call law enforcement if she refused to comply with orders. (*Id.*, ¶ 40.) However, the mere threat of state involvement does not equate to state control or coercion of particular acts, as required under the compulsion test. *Cf. Ginsberg v. Healey Car & Truck Leasing, Inc.*, 189 F.3d 268, 272–73 (2d Cir. 1999) (rejecting the notion that "a private party would be considered a state actor" simply because it "calls for official assistance or protection").

Finally, the Court notes Plaintiff's argument that Defendants are necessarily state actors because their services are subject to state regulation. (*See generally* SAC, ECF No. 32.) Although state regulation may often give the impression of governmental control or coercion, "even heavily-regulated private entities generally are held not to be state actors." *D.L. Cromwell Invs., Inc. v. NASD Regul., Inc.*, 279 F.3d 155, 161 (2d Cir. 2002). Whether regulated conduct is fairly attributable to the state turns on the degree of independence retained by the private actor and, at times, how closely the regulations are enforced. *See, e.g., Barrows*, 24 F.4th at 137–39 (holding that the Medicare statute compelled inpatient admissions decisions made by private utilization review committees ("URCs"), where the "statute expressly require[d] hospitals to form and

18

utilize URCs," "the decision-making process that URCs engage[d] in [was] governed largely by statute and regulation," the government pressured URCs to adhere closely "by engaging in audits and post-payment reviews" with costly appeals, and the government supplied URCs with "extensive education and training materials" used to guide its own assessments of admissions decisions).

Here, Plaintiff alleges that Defendants' actions were compelled by the New York Mental Hygiene Law ("MHL"), which courts have widely held "neither compels nor encourages involuntary commitment." *Rosenberg*, 996 F. Supp. at 349. Rather, the MHL merely "supplies a 'legal framework'" for mental healthcare providers to follow and "leaves the decision whether to commit a patient 'completely to the physician's discretion.'" *Kaplan v. County of Orange*, 528 F. Supp. 3d 141, 154 (S.D.N.Y. 2021) (quoting *Rosenberg*, 996 F. Supp. at 350). "Thus, compliance with the MHL's procedures 'does not convert private action into state action'" under the compulsion test. *Id.* (quoting *Rosenberg*, 996 F. Supp. at 352); *see also Mejía v. Robinson*, No. 16-CV-9706 (GHW), 2018 WL 3821625, at *4–5 (S.D.N.Y. Aug. 10, 2018); *Jones v. Beth Israel Hosp.*, No. 17-CV-3445 (GHW), 2018 WL 1779344, at *3–4 (S.D.N.Y. Apr. 12, 2018); *Jackson v. Barden*, No. 12-CV-1069 (KPF), 2018 WL 340014, at *14–15 (S.D.N.Y. Jan. 8, 2018); *Sybalski v. Indep. Grp. Home Living Program*, No. 06-CV-4899, 2007 WL 1202864, at *3 (E.D.N.Y. Apr. 24, 2007), *aff'd*, 546 F.3d 255 (2d Cir. 2008); *Doe v. Harrison*, 254 F. Supp. 2d 338, 342 (S.D.N.Y. 2003).

Plaintiff has failed to allege facts from which the state's control or coercion of Defendants' conduct can be inferred. The Court accordingly finds that the compulsion test does not provide a basis for her § 1983 claims.

3. *Joint Action Test*

Our Circuit employs several "different formulations of the 'joint action' test." *Patterson v. City of New York*, 758 F. App'x 217, 218 (2d Cir. 2019). For instance, the test is met when the private entity is "jointly engaged with state officials in the prohibited action." *Lugar v. Edmonson Oil Co., Inc.*, 457 U.S. 922, 941 (1982); *see also Sybalski*, 546 F.3d at 257. It may also be met "when the state provides 'significant encouragement' to the entity," when "the entity's functions are 'entwined' with state policies," *Sybalski*, 546 F.3d at 257 (quoting *Brentwood*, 531 U.S. at 296), or when there is otherwise a "symbiotic relationship" between the entity and the state. *Patterson*, 758 F. App'x at 218; *see generally Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 723–25 (1961).

Plaintiff makes an argument under the joint engagement formulation of the test, pointing out that the paramedics and police officer "seized [her] in a joint effort." (Pl.'s Opp'n, ECF No. 38, at 11, 15.) Under Second Circuit precedent, however, "the mere fact that a private actor received police assistance is not sufficient to transform that private actor's conduct into state action for § 1983 purposes." *Meadows*, 963 F.3d at 243. Rather, the plaintiff must show that the officer and private actor "share[d] some common goal to violate the plaintiff's rights," or that the officer otherwise did not "'exercise[] independent judgment in how to respond to [the] private party's . . . request for assistance.'" *Betts v. Shearman*, 751 F.3d 78, 85 (2d Cir. 2014) (quoting *Ginsberg v. Healey Car & Truck Leasing, Inc.*, 189 F.3d 268, 272 (2d Cir. 1999)).

A common goal may be inferred from facts asserted in well-pleaded allegations. For instance, state action was adequately pleaded in *Bang v. Utopia Restaurant*, where the plaintiffs alleged that they were unlawfully arrested at a restaurant after the officer first spoke to the owner for twenty minutes. 923 F. Supp. 46, 49 (S.D.N.Y. 1996) (cited favorably in *Betts*, 751 F.3d at 85). Similarly, in *White v. Moylan*, the plaintiff sufficiently

pleaded a joint effort by alleging not only that a police officer had arrested him for shoplifting at a private party's store, but that, together with store security, the officer had reviewed surveillance footage and fabricated a reason for the arrest. *See* 554 F. Supp. 2d 263, 265, 267 (D. Conn. 2008) (cited favorably in *Betts*, 751 F.3d at 85–86).

In this case, Plaintiff fails to allege facts from which to infer a common goal. As to Hatzalah, Plaintiff alleges only that law enforcement responded together with Maimonides's paramedics when Hatzalah "call[ed] for back-up" and that Hatzalah's paramedics waited outside after the police officer arrived. (*See* SAC, ECF No. 32, at 6–7, ¶¶ 33–34.) As to Maimonides, Plaintiff alleges only that the officer entered her home at the same time as Maimonides's paramedics, voiced his agreement with the paramedics' assessment that Plaintiff needed to go to the hospital, and, in that manner, assisted them in seizing Plaintiff's person. (*See id.* at 6–7, ¶¶ 33–34, 37.) Although these claims certainly allege police assistance, they do not support a reasonable inference that the officer and Maimonides conspired to deprive Plaintiff of her constitutional rights, or that the officer did not act per his independent judgment. *See Ginsberg*, 189 F.3d at 272 ("Where, as here, a police officer exercises independent judgment in how to respond to a private party's legitimate request for assistance, the private party is not jointly engaged in the officer's conduct so as to render it a state actor under Section 1983." (quotation marks omitted)). Because Plaintiff alleges no other involvement by the police officer in the chain of events that led to her involuntary commitment, joint engagement cannot be reasonably inferred from the Second Amended Complaint.

Similarly, while the officer's involvement with Maimonides's paramedics seemingly goes to the "significant encouragement" formulation of joint action, Plaintiff's allegations do not plausibly support this theory either. Like the compulsion

test,[6] "[m]ere approval of or acquiescence in the initiatives of a private party is not sufficient" to establish state action. *Blum*, 457 U.S. at 1004. Yet that is all Plaintiff alleges here. Although the officer "chimed in[,] in agreement," and impliedly encouraged Maimonides's paramedics to continue their course of action, that is not the kind of significant encouragement contemplated by the joint action test. (*See* SAC, ECF No. 32, at 6–7, ¶ 34.)

As for the entwinement and symbiotic relationship formulations of the test, Plaintiff's allegations also do not suffice. By entwinement, courts mean a "'pervasive entwinement to the point of largely overlapping identity' between the State and the entity" — for instance, where a private library is publicly funded and "one-half of its governing board" is publicly appointed. *Horvath v. Westport Libr. Ass'n*, 362 F.3d 147, 154 (2d Cir. 2004) (quoting *Brentwood*, 531 U.S. at 303). Separately, the symbiotic relationship formulation of the test generally requires state ownership of an "interlinked business" or "financial stake" in the private entity's unlawful conduct. *See Hadges v. Yonkers Racing Corp.*, 918 F.2d 1079, 1082 (2d Cir. 1990); *see also Island Online, Inc. v. Network Sols., Inc.*, 119 F. Supp. 2d 289, 306–07 (E.D.N.Y. 2000) (explaining that the symbiotic relationship test is "limited to cases involving leases of public property" and "cases where the State benefits financially from a private entity's discriminatory conduct"). Neither a pervasive entwinement or symbiotic relationship is supported by the relatively discrete set of facts alleged in Plaintiff's pleadings, which are confined to

---

[6] "[T]he Second Circuit's descriptions of the three tests often split[] up *Blum*'s references to 'coercion' and 'significant encouragement' among two separate tests, assigning the 'significant encouragement' language to the 'joint action' . . . test and the 'coercion language to the 'compulsion' test." *Alexander v. Azar*, No. 11-CV-1703 (MPS), 2020 WL 1430089, at *44 (D. Conn. Mar. 20, 2020), *aff'd sub nom. Barrows v. Becerra*, 24 F.4th 116 (2d Cir. 2022) (affirming the district court's application of the "compulsion" or "significant encouragement" tests). Accordingly, the Court cites *Blum* in both contexts.

the events of her involuntary commitment and not such matters as Defendants' ownership or relationship with the state.

Plaintiff thus fails to allege sufficient facts from which to plausibly infer state action under any formulation of the joint action test, as well as any of the other "main tests" for state action. *Fabrikant*, 691 F.3d at 207. Construing her allegations liberally, the Court finds no other basis for concluding that Defendants' conduct is "'fairly attributable' to the state," and therefore respectfully recommends dismissing each of Plaintiff's § 1983 claims against Defendants.[7] *Id.*

## B.  EMTALA Claim

Plaintiff's remaining federal claim is her EMTALA claim against Maimonides. "EMTALA, commonly known as the Patient Anti-Dumping Act, states that an individual seeking emergency care from a Medicare-participating hospital with an emergency room must be provided 'an appropriate medical screening examination . . . to determine whether or not an emergency medical condition exists.'"[8] *Cooper v. City of New York*, No. 14-CV-3698 (ENK) (PK), 2016 WL 4491719, at *2 (E.D.N.Y. Aug. 25, 2016) (footnote omitted) (quoting 42 U.S.C. § 1395dd(a)). EMTALA provides a cause of action to "[a]ny individual who suffers personal harm as a direct result of a participating hospital's violation." 42 U.S.C. § 1395dd(d)(2)(A).

---

[7] Plaintiff's claims against Hatzalah should also be dismissed on the basis that she failed to allege whether Hatzalah's paramedics violated her constitutional rights pursuant to an official policy by Hatzalah itself. As Judge Kovner observed, such allegations are necessary to hold "[p]rivate employers . . . liable under § 1983 for the constitutional torts of their employees." *Rojas v. Alexander's Dep't Store, Inc.*, 924 F.2d 406, 408 (2d Cir. 1990). (*See* Apr. 21, 2022 ECF Order.) Plaintiff has asserted only that Maimonides's paramedics acted pursuant to such a policy. (*See generally* Pl.'s Mem. of Law, ECF No. 31.)

[8] EMTALA also imposes a stabilization requirement. *See* 42 U.S.C. § 1395dd(b).

Here, Plaintiff alleges that Maimonides violated EMTALA's screening requirement by failing "to evaluate [her] in the emergency room, prior to placing [her] under observation" and "without being seen by a doctor." (SAC, ECF No. 32, at 35, ¶¶ 126–27.) Maimonides contends that this cause of action is time-barred. (Maimonides MTD, ECF No. 36, at 22.) In its view, Plaintiff's EMTALA claim is in fact a claim for medical malpractice. (*Id.*) Because the underlying events occurred in December 2018, Maimonides argues that Plaintiff's claim is barred by New York's two-and-a-half-year limitations period for medical malpractice claims. (*Id.* (citing N.Y. C.P.L.R. § 214-A).) Plaintiff resists this characterization of her claim, directing the Court instead to EMTALA's cause of action. (*See* Pl.'s Opp'n, ECF No. 38, at 18 (citing 42 U.S.C. § 1395dd(d)(2)(C)).) Acknowledging, however, that such actions cannot be brought "more than two years after the date of the violation," Plaintiff argues that the two-year period began to run in July 2020, when she first "learned that the defendants' actions were against the law." 42 U.S.C. § 1395dd(d)(2)(C); (SAC, ECF No. 32, at 35, ¶ 131).

Interpreting Plaintiff's claim as a cause of action under EMTALA, it is still time-barred. *Cf. Domnister v. Exclusive Ambulette, Inc.*, 607 F.3d 84, (2d Cir. 2010) ("As 'masters of the complaint,' plaintiffs were entitled to construct their complaint in this fashion . . . ."). Under EMTALA, no action "may be brought . . . more than two years after *the date of the violation.*" 42 U.S.C. § 1395dd(d)(2)(C) (emphasis added). This limitation is best understood as a statute of repose that forecloses any action brought more than two years after the date of the alleged violation, not the date of discovery.

"Although '[s]tatutes of repose and statutes of limitations are often confused[,] . . . they are [nonetheless] distinct' and serve distinct purposes." *Police & Fire Ret. Sys. of City of Detroit v. IndyMac MBS, Inc. ("Police & Fire Retirement Sys.")*, 721 F.3d 95, 106 (2d Cir. 2013) (quoting *Ma v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 597 F.3d

24

84, 88 n.4 (2d Cir. 2010)) (alterations in *Police & Fire Retirement Sys.*). Statutes of limitations create "'a time limit for suing in a civil case, based on the date when the claim accrued.'" *CTS Corp. v. Waldburger*, 573 U.S. 1, 8 (2014) (quoting *Statute of Limitations*, Black's Law Dictionary (9th ed. 2009)). "In a personal-injury or property-damage action, for example, more often than not this will be 'when the injury occurred or was discovered.'" *Cal. Pub. Emps.' Retirement Sys. v. ANZ Sec., Inc.*, 137 S. Ct. 2042, 2049 (2017) (quoting *CTS Corp.*, 573 U.S. at 8).

"A statute of repose, on the other hand, puts an outer limit on the right to bring a civil action. That limit is measured not from the date on which the claim accrues but instead from the date of the last culpable act or omission of the defendant." *CTS Corp.*, 573 U.S. at 8; *see also Statute of Repose*, Black's Law Dictionary (11th ed. 2019) (defining statute of repose as "[a] statute barring any suit that is brought after a specified time since the defendant acted . . . , even if this period ends before the plaintiff has suffered a resulting injury"). [9]

The EMTALA statute provides, in pertinent part, as follows: "No action may be brought under this paragraph more than two years after the date of the violation with respect to which the action is brought." 42 U.S.C. § 1395dd(d)(2)(C). This formulation is closely analogous to the language in the Securities Act determined to be a statute of

---

[9] For example, the Supreme Court has concluded that Section 13 of the Securities Act, which bars claims "'brought to enforce a liability created under [§ 11] more than three years after the security was bona fide provided to the public,'" contains a statute of repose because the three-year period "runs from the defendant's last culpable act (the offering of the securities), not from the accrual of the claim (the plaintiff's discovery of the defect in the registration statement)." *ANZ Sec.*, 137 S. Ct. at 2047, 2049 (quoting 15 U.S.C. § 77m). The Supreme Court has also identified a statute of repose in 29 U.S.C. § 1113, which bars certain ERISA claims "six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation." 29 U.S.C. § 1113; *see Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 140 S. Ct. 768, 774 (2020).

repose in *Police & Fire Retirement Sys.*, where the statute provided, in pertinent part: "In no event shall any such action be brought to enforce a liability [created under specific subsections of the Securities Act] more than three years after the [underlying] security was bona fide offered to the public, or [under another section of the Securities Act] more than three years after [its] sale." 15 U.S.C. § 77m; *see Police & Fire Retirement Sys.*, 721 F.3d at 107 (discussing and quoting 15 U.S.C. § 77m). Both EMTALA and the Securities Act provide that no "action" may be brought after a specified time period, and in both statutes, the time period begins with action or inaction by a putative defendant. In EMTALA, the time period begins to run when a provider violates the law's requirements; in the Securities Act, the time period begins with the offering or sale of a security. Neither statute provides for any exceptions or that the limitation on suit will be triggered by discovery of a violation.[10]

Accordingly, the Court finds that the time to bring an EMTALA claim is tied to a defendant's allegedly unlawful act. As applied in this case, the two-year clock began to run from the date the hospital allegedly failed to comply with the screening requirement. *Accord Kizzire v. Baptist Health Sys., Inc.*, 441 F.3d 1306, 1310 (11th Cir. 2006) (holding that EMTALA claims must be brought within two years of "when a hospital either fails to adequately screen a patient, or discharges or transfers the patient without

---

[10] This language contrasts sharply with the Securities Act's limitation on other actions, brought under different subsections. As to those, Section 77m provides as follows:

> No action shall be maintained to enforce any liability created under section 77k or 77l(a)(2) of this title unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence, or, if the action is to enforce a liability created under section 77l(a)(1) of this title, unless brought within one year after the violation upon which it is based.

15 U.S.C. § 77m.

first stabilizing his emergency medical condition"); *Vogel v. Linde*, 23 F.3d 78, 80 (4th Cir. 1994) (concluding that EMTALA claim, brought two years and ten months after the date of the alleged violation was barred "[u]nder the plain language of the statute" and that the statute did not provide for any exceptions or tolling); *Saltares v. Hosp. San Pablo, Inc.*, 371 F. Supp. 2d 28, 33 (D.P.R. 2005) ("EMTALA claims accrue not when the aggrieved party gained knowledge of the injury but when the actual violation took place."); *Kizzire v. Baptist Health Sys., Inc.*, 343 F. Supp. 2d 1074, 1084–85 (N.D. Ala. 2004) ("The law is clear however, that the violation centers around treatment, or the lack thereof at the time the patient appears at the hospital."), *aff'd*, 441 F.3d 1306 (11th Cir. 2006); *Owens v. Presbyterian Hosp. in City of N.Y.*, No. 94-CV-6004 (RPP), 1995 WL 464950, at *1–2 (S.D.N.Y. Aug. 4, 1995) (holding that patient's EMTALA claim was time-barred even though patient first discovered injuries undetected by hospital over five years after receiving treatment by hospital), *aff'd*, 101 F.3d 682 (2d Cir. 1996); *Brewer ex rel. Brewer v. Miami Cnty. Hosp.*, 862 F. Supp. 305, 307–08 (D. Kan. 1994) (examining legislative history and concluding that Congress did not intend for equitable tolling to apply to EMTALA claims).

"The distinction between statutes of limitation and statutes of repose is important because the former are generally subject to equitable tolling," including the discovery rule, "while the latter are not." *United States ex rel. Wood v. Allergan, Inc.*, No. 19-CV-4029 (JMF), 2020 WL 3073293, at *2 (S.D.N.Y. June 10, 2020) (citing *Pasternack v. Shrader*, 863 F.3d 162, 176 (2d Cir. 2017)); *see also id.* ("[T]he discovery rule . . . provides that accrual is delayed until the plaintiff has discovered his cause of action." (quotation marks omitted)). Accordingly, a statute of repose "carries significant practical consequences" for plaintiffs; in some cases, it "'may bar a claim *even before the plaintiff suffers injury*, leaving her without any remedy.'" *Police & Fire Retirement Sys.*, 721 F.3d at

106 (quoting *Fed. Housing Fin. Agency v. UBS Ams. Inc.*, 712 F.3d 136, 140 (2d Cir. 2013)).

This is because "in contrast to statutes of limitations, statutes of repose 'create[] a

substantive right in those protected to be free from liability after a legislatively-

determined period of time.'" *Police & Fire Retirement Sys.*, 721 F.3d at 106 (quoting

*Amoco Prod. Co. v. Newton Sheep Co.*, 85 F.3d 1464, 1472 (10th Cir. 1996) (quotation marks

omitted)).

　　With EMTALA, Congress created a federal cause of action, but also placed a

strict limit on the time period under which medical providers could be held liable under

its provisions. As a consequence, Plaintiff's EMTALA claim was barred as of December

10, 2020, two years from the date of the alleged violation of the law's screening

requirement, i.e., Maimonides's failure "to evaluate [Plaintiff] in the emergency room,

prior to placing [her] under observation." (SAC, ECF No. 32, at 4, 35, ¶¶ 16, 126.)

Plaintiff filed the Complaint more than one and a half years after the limitations period

had run, on July 6, 2021. (*See* Compl., ECF No. 1.) Accordingly, her fifth cause of action

should be dismissed as time-barred under EMTALA's statute of repose.[11]

---

[11] Even if Plaintiff were correct that her time to file should be subject to tolling under the discovery rule, her EMTALA claim remains time-barred. Under the discovery rule, the running of a plaintiff's time to file is "postponed until the plaintiff has or with reasonable diligence should have discovered the critical facts of both [her] injury and its cause.'" *Corcoran v. N.Y. Power Auth.*, 202 F.3d 530, 544 (2d Cir. 1999) (quoting *Kronisch v. United States*, 150 F.3d 112, 121 (2d Cir. 1999)). "Discovery of the 'critical facts' of injury and causation," however, "'requires only knowledge of, or knowledge that could lead to, the basic facts of the injury, i.e., knowledge of the injury's existence and knowledge of its cause or of the person or entity that inflicted it.'" *Id.* (quoting *Kronisch*, 150 F.3d at 121). In other words, the plaintiff need only know "enough of the critical facts of injury and causation to protect" herself were she to "seek[] legal advice." *Kronisch*, 150 F.3d at 121.

　　To establish her EMTALA claim based on Maimonides's violation of the screening requirement, Plaintiff needed only to establish that she "show[ed] up for treatment at a hospital's emergency room" and that the hospital failed to "provide for an appropriate medical screening examination . . . to determine whether or not an emergency medical condition" existed. *Hardy v. N.Y.C. Health & Hosp. Corp.*, 164 F.3d 789, 792 (2d Cir. 1999). Since Plaintiff's allegations are that Maimonides failed to provide an examination at the emergency room

28

### C. State Law Claims

If Plaintiff's § 1983 and EMTALA claims are dismissed, there will be no other claims by which Plaintiff can establish federal jurisdiction. Accordingly, the Court now turns to Plaintiff's remaining state law claims to determine whether retaining federal jurisdiction over them is appropriate. *See Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 56 (2d Cir. 2004) (stating that when "a federal court dismisses all claims over which it had original jurisdiction, it must reassess its jurisdiction over the case").

"[F]ederal courts are courts of limited jurisdiction" and generally authorized only to hear cases arising under federal question or diversity jurisdiction. *Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 374 (1978); *see* 28 U.S.C. §§ 1331, 1332. Given the lack of complete diversity among the parties, Plaintiff's case was premised on federal question jurisdiction in light of her § 1983 and EMTALA claims. *See* 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."); *see also id.* § 1332(a) (defining complete diversity). Plaintiff's state law claims were properly before the court only by virtue of supplemental jurisdiction. *See* 28 U.S.C. § 1367(a). In other words, although the court ordinarily lacked subject matter jurisdiction over the state law claims, the court could still hear and decide them on the basis that they were "so related" to Plaintiff's federal claims "that they form[ed] part of the same case or controversy." *Id.*

That said, where a "court has dismissed all claims over which it has original jurisdiction," the court in its discretion "may decline to exercise supplemental

---

*whatsoever*, she necessarily knew the "critical facts of injury and causation" at such time. *Kronisch*, 150 F.3d at 121. Accordingly, even if the discovery rule applies, Plaintiff's two-year clock began to run from the date of Maimonides's alleged EMTALA violation. The date Plaintiff "discovered" that there might be a federal claim on this basis is irrelevant. (*See* SAC, ECF No. 32, at 35, ¶ 131 (averring that the limitation period began to run in July 2020, when Plaintiff first "learned that the defendants' actions were against the law").)

jurisdiction" over the remaining state law claims. 28 U.S.C. § 1367(c). This decision is guided by the *Cohill* factors: "judicial economy, convenience, fairness, and comity." *Uzan*, 388 F.3d at 56; *see also Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988). "[A]s a general proposition," however, "'if [all] federal claims are dismissed *before trial* . . . , the state claims should be dismissed as well.'" *Uzan*, 388 F.3d at 56 (quoting *Castellano v. Bd. of Trs.*, 937 F.2d 752, 758 (2d Cir. 1991)); *see also Cohill*, 484 U.S. at 350 n.7 (observing that "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors" will ordinarily "point toward declining to exercise jurisdiction over the remaining state-law claims"). This includes instances where, as here, the jurisdiction-invoking claims are dismissed on a timely Rule 12(b)(6) motion. *See, e.g., Turner v. N.Y. Rosbruch/Harnik, Inc.*, 84 F. Supp. 3d 161, 170–71 (E.D.N.Y. 2015); *Camhi v. Glen Cove City Sch. Dist.*, 920 F. Supp. 2d 306, 312–13 (E.D.N.Y. 2013); *Johnson v. Levy*, 812 F. Supp. 2d 167, 184–85 (E.D.N.Y. 2011).

In this case, the *Cohill* factors weigh in favor of declining to exercise supplemental jurisdiction over Plaintiff's remaining state law claims. Relatively speaking, this is not a case where "dismissal of the federal claim occurs late in the action, after there has been substantial expenditure in time, effort, and money." *Purgess v. Sharrock*, 33 F.3d 134, 138 (2d Cir. 1994) (quotation omitted). As set forth above, Plaintiff filed the Complaint in July 2021, and Defendants notified the Court of their intention to file 12(b)(6) motions to dismiss on November 15, 2021, and December 8, 2021, respectively. (*See* Compl., ECF No. 1; Hatzalah's Mot. for Pre-Mot. Conference, ECF No. 13; Maimonides's Dec. 8, 2021 Letter, ECF No. 16.) After additional rounds of motions and amended complaints, Defendants filed the current motions to dismiss in June 2022 — all in all, within a year of when Plaintiff initiated the action and before any discovery took place. (*Compare* Compl., ECF No. 1, *with* Hatzalah MTD, ECF No. 35, *and*

Maimonides MTD, ECF No. 36.) Moreover, this is not a case where the parties have spent several years litigating the case thus far, or where "the parties have already completed discovery," such that dismissal would not further judicial economy and would result in unfairness to the parties. *Finkelstein v. Mardkha*, 495 F. Supp. 2d 329, 345 (S.D.N.Y. 2007) (retaining supplemental jurisdiction); *see also Drake v. Lab'y Corp. of Am. Holdings*, 323 F. Supp. 2d 449, 454–55 (E.D.N.Y. 2004) (same).

The Court also notes that "New York state courts are . . . in the best position to determine" whether any of Plaintiff's state law claims are time-barred, as Defendants argue.[12] *See Cave v. E. Meadow Union Free Sch. Dist.*, 514 F.3d 240, 250 (2d Cir. 2008) (acknowledging that novel issues of state law presented by a case weigh in favor of withdrawing supplemental jurisdiction). Further, the Court notes that Plaintiff will not suffer substantive prejudice. To the extent any of Plaintiff's state law claims were timely filed, the tolling provision in 28 U.S.C. § 1367(d) operates to preserve her right to refile them within thirty days of dismissal. *See* 28 U.S.C. § 1367(d) (providing that the limitations periods for claims brought under supplemental jurisdiction are "tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period").

---

[12] The Court notes that it is at least unclear whether several of Plaintiff's claims are time-barred under New York law. The parties contest, for instance, whether Plaintiff's claims sound in medical malpractice and are, consequently, barred under New York's two-and-a-half year statute of limitations. (*See* Maimonides MTD, ECF No. 36, at 20 (citing N.Y. C.P.L.R. § 214-A).) New York courts are better situated to resolve this issue. *See, e.g., Karasek v. LaJoie*, 92 N.Y.2d 171, 176 (1998) (explaining that, "while it may be reasonable to infer that the diagnostic and treatment services provided by . . . medically trained psychiatrists are 'medical' in nature," and thus, considered medical treatment for the purposes of N.Y. C.P.L.R. § 214-A, "the same cannot be said about the services rendered by psychologists and other mental health care professionals").

## CONCLUSION

For the reasons discussed herein, the Court recommends that Defendants' motions to dismiss (ECF Nos. 35 & 36) be granted and that Plaintiff's claims be dismissed as follows. Plaintiff's federal claims, styled as counts **three** and **four** against Hatzalah, counts **three** and **four** against Maimonides Paramedic Services (including the John and Jane Doe defendants), and counts **two**, **three**, and **five** against Maimonides itself should be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). (*See* SAC, at 28–29, ¶¶ 56–64 (federal claims against Hatzalah); *id.* at 31, ¶¶ 78–85 (federal claims against Maimonides Paramedic Services and paramedics); *id.* at 33–34 & 35, ¶¶ 107–14, 124–31) (federal claims against Maimonides).) In addition, the Court recommends declining to exercise supplemental jurisdiction over Plaintiff's remaining state law claims and dismissing them without prejudice. *See* 28 U.S.C. § 1367(c).

*    *    *    *    *

This Report and Recommendation will be filed electronically and sent by mail to Plaintiff Lanit Amira. Objections to this Report and Recommendation must be filed, with a courtesy copy sent to the Honorable Rachel P. Kovner, at 225 Cadman Plaza East, Brooklyn, New York 11201, within fourteen (14) days of filing. Failure to file objections within the specified time waives the right to appeal both before the district court and appellate courts. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); *see also* Fed. R. Civ. P. 6(a) (providing the method for computing time). Failure to file objections within the specified time waives the right to appeal the District Court's order. *See, e.g., Caidor v.*

*Onondaga County*, 517 F.3d 601, 604 (2d Cir. 2008) (explaining that "failure to object timely to a . . . report [and recommendation] operates as a waiver of any further judicial review of the magistrate [judge's] decision" (quotation marks omitted)).

      **SO ORDERED.**

Dated:    Brooklyn, New York
            November 30, 2022

                      *Taryn A. Merkl*
                      TARYN A. MERKL
                      UNITED STATES MAGISTRATE JUDGE